1    Benjamin B. Anger, SBN 269145
     ben.anger@morganlewis.com

2    MORGAN, LEWIS & BOCKIUS LLP
     600 Anton Boulevard

3    Costa Mesa, CA  92626
     T: (714) 830-0600 / F: (714) 830-0700

4

5    JOSHUA M. DALTON (*pro hac vice*)
     josh.dalton@morganlewis.com

6    MORGAN, LEWIS & BOCKIUS LLP
     One Federal Street

7    Boston, MA 02110-1726
     T: (617) 341-7700 / F: (617) 341-7701

8

9    *Counsel for Defendants Kristopher Takahashi*
   *and Alexander Taylor*

10

11

### UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 12   DAYBREAK GAME COMPANY LLC, | CASE NO. 3:25-CV-01489 |
| 13        Plaintiff, | **DEFENDANTS' KRISTOPHER** |
| 14        v. | **TAKAHASHI AND ALEXANDER TAYLOR OPPOSITION TO** |
| 15   KRISTOPHER TAKAHASHI; | **PLAINTIFF'S SUPPLEMENTAL MOTION FOR PRELIMINARY** |
| 16   ALEXANDER TAYLOR; and Does 1-20, Inclusive, | **INJUNCTION** |
| 17        Defendants. | Date: August 12, 2025 |
| 18 | Time: 10:30 am<br>Place: Courtroom 12b 12th Floor |
| 19 | Judge: Hon. Cynthia Bashant |

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................... 1

II. BACKGROUND ................................................................................................... 2

   A. The Twenty-Five Year History and Relationship Between EverQuest and Emulators ............................................................................................. 2

   B. The Heroes' Journey Development and Another Quest LLC .......................... 3

III. STANDARD OF REVIEW ................................................................................. 4

IV. ARGUMENT ...................................................................................................... 5

   A. Daybreak's Request for Mandatory Injunctive Relief Should Be Denied. ...... 5

   B. Daybreak Cannot Show a Substantial Likelihood of Success on the Merits ................................................................................................................ 6

      1. Equitable Estoppel Bars Daybreak's Claims. ........................................... 6

         a. Daybreak and Its Predecessors Knew About EQ Emulators, Like THJ, for Decades and Did Nothing. ........................................... 7

         b. For Decades, Daybreak and Its Predecessors Created an Impression They Were Acceptable. ...................................................... 7

         c. Daybreak's Inaction and Public Statements Gave Defendants Reasonable Impression Emulator Conduct Was Acceptable. ............... 9

         d. Defendants Detrimentally Relied on Daybreak's Conduct ................. 9

      2. Laches Bars Plaintiff's Claims, at Least for Injunctive Relief. ............... 10

         a. Laches Bars the Requested Injunction for the Copyright Claim. ..... 10

         b. Laches Bars Plaintiff's Trademark Claims. ...................................... 11

      3. Plaintiff Cannot Show a Likelihood of Success on Its Claims. ............... 12

         a. Daybreak Fails to Adequately Plead Direct or Vicarious Copyright Infringement. .................................................................... 12

         b. Daybreak Fails to Adequately Plead a Violation of the DMCA ....... 14

         c. Plaintiff's Trademark Infringement Claims Also Fails ..................... 15

         d. Daybreak Fails to State a Claim for Breach of Contract ................... 17

      4. Daybreak's Complaint Names Improper Defendants. ............................. 18

   C. Daybreak Will Not Suffer Irreparable Harm If the Motion Is Denied. .......... 18

      1. Daybreak's Delay Rebuts Any Presumption of Irreparable Harm. ......... 18

      2. Daybreak Provides Insufficient Evidence of Irreparable Harm. ............. 19

         a. Daybreak's Claimed Damage to Goodwill and Reputation Is Not Irreparable Injury. ....................................................................... 20

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

     b.   Daybreak's Alleged Financial Peril Is Contradictory and Insufficiently Attributed to Defendants to Merit an Injunction. ....... 20

     c.   Daybreak Provides No Evidence That Money Damages Are Insufficient. ......................................................................................... 23

  D.  The Balance of the Equities Favors Denying Injunctive Relief. .................... 24

  E.  A Preliminary Injunction Does Not Favor the Public Interest. ........................ 24

V. CONCLUSION ....................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A & M Records, Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001) ............................................................................. 25

*AK Metals, LLC v. Norman Indus. Materials*,
2013 WL 417323 (S.D. Cal. Jan. 31, 2013) ........................................................ 19

*Alliance for the Wild Rockies, Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ............................................................................. 24

*Am. Int'l Grp., Inc. v. Am. Int'l Bank*,
926 F.2d 829 (9th Cir. 1991) (Kozinski, J., dissenting) ...................................... 12

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*,
750 F.2d 1470 (9th Cir. 1985) ............................................................................. 23

*Anderson v. United States*,
612 F.2d 1112 (9th Cir. 1979) ............................................................................... 5

*ArcSoft, Inc. v. CyberLink Corp.*,
153 F. Supp. 3d 1057 (N.D. Cal. 2015) ........................................................ 16, 23

*Armstrong v. Michaels Stores, Inc.*,
2018 WL 6505997 (N.D. Cal. Dec. 11, 2018) .................................................... 17

*Aurora World, Inc. v. Ty Inc.*,
719 F. Supp. 2d 1115 (C.D. Cal. 2009) ............................................................... 24

*Authen Tec, Inc. v. Atrua Techs., Inc.*,
2009 WL 765144 (N.D. Cal. Mar. 19, 2009) ........................................................ 6

*Barcamerica Int'l USA Tr. v. Tyfield Imps., Inc.*,
289 F.3d 589 (9th Cir. 2002) ............................................................................... 20

*Battelle Energy All., LLC v. Southfork Sec., Inc.*,
980 F. Supp. 2d 1211 (D. Idaho 2013) .................................................................. 5

*Baxter v. MCA, Inc.*,
812 F.2d 421 (9th Cir. 1987) ......................................................................... 12, 13

*Bosley Med. Inst., Inc. v. Kremer*,
   403 F.3d 672 (9th Cir. 2005) ................................................................ 16

*Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*,
   174 F.3d 1036 (9th Cir. 1999) .............................................................. 15

*CycleBar Franchising, LLC v. StarCycle Franchise, LLC*,
   2020 WL 3840442 (C.D. Cal. Mar. 27, 2020) .................................... 23

*Dahl v. Swift Dist., Inc.*,
   2010 WL 1458957 (C.D. Cal. 2010) ................................................... 22

*Danjaq LLC v. Sony Corp.*,
   263 F.3d 942 (9th Cir. 2001) ............................................................... 11

*DealDash Oyj v. ContextLogic Inc.*,
   2018 WL 3820654 (N.D. Cal. Aug. 10, 2018) ..................................... 5

*E-Systems, Inc. v. Monitek, Inc.*,
   720 F.2d 604 (9th Cir. 1983) ............................................................... 11

*Eat Right Foods Ltd. v. Whole Foods Mkt., Inc.*,
   880 F.3d 1109 (9th Cir. 2018) .............................................................. 11

*Edge Games, Inc. v. Elec. Arts, Inc.*,
   745 F. Supp. 2d 1101 (N.D. Cal. 2010) .............................................. 24

*Eidmann v. Walgreen Co.*,
   522 F. Supp. 3d 634 (N.D. Cal. 2021) ................................................. 17

*Entrepreneur Media, Inc. v. Smith*,
   279 F.3d 1135 (9th Cir. 2002) .............................................................. 16

*Evergreen Safety Council v. RSA Network, Inc.*,
   697 F.3d 1221 (9th Cir. 2012) ....................................................... 10, 11

*Field v. Google Inc.*,
   412 F. Supp. 2d 1106 (D. Nev. 2006) ................................................. 10

*Garcia v. Google Inc.*,
   786 F.3d 733 (9th Cir. 2015) ...................................................... 5, 6, 19

*Google LLC v. Oracle Am., Inc.*,
   593 U.S. 1 (2021) ................................................................................. 14

*Grupo Gigante SA de CV v. Dallo & Co.*,
   391 F.3d 1088 (9th Cir. 2004) .................................................................................. 12

*Hampton v. Paramount Pictures Corp.*,
   279 F.2d 100 (9th Cir. 1960) ................................................................................... 6

*Harman Int'l Indus., Inc. v. Jem Accessories, Inc.*,
   668 F. Supp. 3d 1025 (C.D. Cal. 2023) ................................................................. 12

*Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*,
   736 F.3d 1239 (9th Cir. 2013) ......................................................................... 16, 19

*Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp.*,
   518 F.2d 913 (9th Cir. 1975) ........................................................................... 10, 11

*Ketab Corp. v. Mesriani & Assocs., P.C.*,
   734 F. App'x 401 (9th Cir. 2018) ........................................................................ 16

*Lilith Games (Shanghai) Co. Ltd. v. uCool, Inc.*,
   No. 5:15-cv-01267 ................................................................................................ 13

*Litton Sys. Inc. v. Sundstrand Corp.*,
   750 F.2d 952 (Fed. Cir. 1984) .............................................................................. 24

*Mayview Corp. v. Rodstein*,
   480 F.2d 714 (9th Cir. 1973) .................................................................................. 4

*MDY Indus., LLC v. Blizzard Ent., Inc.*,
   629 F.3d 928 (9th Cir. 2010) ................................................................................ 15

*Mesler v. Bragg Mgmt. Co.*,
   39 Cal. 3d 290 (Cal. 1985) (en banc) .................................................................. 18

*Miller v. Cal. Pac. Med. Ctr.*,
   991 F.2d 536 (9th Cir. 1993) ................................................................................ 19

*Nutrition 21 v. United States*,
   930 F.2d 867 (Fed. Cir. 1991) .............................................................................. 23

*Oakland Tribune, Inc. v. Chronicle Pub. Co.*,
   762 F.2d 1374 (9th Cir. 1985) .............................................................................. 19

*Oracle Am., Inc. v. Terix Comput. Co., Inc.*,
   2015 WL 1886968 (N.D. Cal. Apr. 24, 2015) ....................................................... 9

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
  572 U.S. 663 (2014)...........................................................................................6, 10

*Pinkette Clothing, Inc. v. Cosmetic Warriors Ltd.*,
  894 F.3d 1015 (9th Cir. 2018) .............................................................................11

*Pollution Denim & Co. v. Pollution Clothing Co.*,
  547 F. Supp. 2d 1132 (C.D. Cal. 2007)..................................................................4

*Pom Wonderful LLC v. Pur Beverages LLC*,
  2015 WL 10433693 (C.D. Cal. Aug. 6, 2015) .....................................................20

*Puma SE v. Forever 21, Inc.*,
  2017 WL 4771003 (C.D. Cal. June 2, 2017)........................................................19

*Quest Software, Inc. v. DirecTV Operations, LLC*,
  2011 WL 4500922 (C.D. Cal. Sept. 26, 2011)......................................................17

*Robbins v. Lee*,
  2006 WL 8444872 (C.D. Cal. Sept. 29, 2006).......................................................9

*Salinger v. Colting*,
  607 F.3d 68 (2d Cir. 2010) .....................................................................................5

*Sega Enters. Ltd. v. Accolade, Inc.*,
  977 F.2d 1510 (9th Cir. 1992)........................................................................13, 14

*Senate of State of Cal. v. Mosbacher*,
  968 F.2d 974 (9th Cir. 1992)............................................................................6, 24

*Sid Berk, Inc. v. Uniroyal, Inc.*,
  425 F. Supp. 22 (C.D. Cal. 1977)...........................................................................4

*Silvercrest Realty, Inc. v. Great Am. E&S Ins. Co.*,
  2012 WL 13028094 (C.D. Cal. Apr. 4, 2012).......................................................17

*Smoothreads, Inc. v. Addventure Prods., Inc.*,
  2009 WL 10671911 (S.D. Cal. Sept. 29, 2009) ...................................................17

*Sonner v. Premier Nutrition Corp.*,
  971 F.3d 834 (9th Cir. 2020) ................................................................................17

*Sonora Diamond Corp. v. Superior Court*,
  83 Cal. App. 4th 523 (2000)..................................................................................18

*Sony Comput. Ent., Inc. v. Connectix Corp.*,
    203 F.3d 596 (9th Cir. 2000) ................................................................................13

*Stanley v. Univ. of S. Cal.*,
    13 F.3d 1313 (9th Cir. 1994) ................................................................................5

*Suja Life, LLC v. Pines Int'l, Inc.*,
    2016 WL 6157950 (S.D. Cal. Oct. 24, 2016) ......................................................22

*Telephia, Inc. v. Cuppy*,
    2005 WL 5884441 (N.D. Cal. Mar. 11, 2005) ....................................................23

*Thermogenesis Corp. v. Origen Biomedical, Inc.*,
    2014 WL 4930678 (E.D. Cal. Sept. 29, 2014) ....................................................19

*Wahoo Int'l, Inc. v. Phix Dr., Inc.*,
    2014 WL 2106482 (S.D. Cal. May 20, 2014) ......................................................18

*Winter v. Nat. Res. Def. Council*,
    555 U.S. 7 (2008)....................................................................................................4

*Yellowcake, Inc. v. Hyphy Music, Inc.*,
    2021 WL 3052535 (E.D. Cal. July 20, 2021)......................................................16

*Zamfir v. Casperlabs, LLC*,
    28 F.Supp.3d 1136 (S.D. Cal. 2021) ...................................................................19

**Statutes**

15 U.S.C. §§ 1125(a) ...............................................................................................15

17 U.S.C. § 106.........................................................................................................14

17 U.S.C. § 107.........................................................................................................14

17 U.S.C. § 1201(a)(1)..............................................................................................14

Cal. Corp. Code § 7703.04(a)...................................................................................18

Cal. Corp. Code § 17703.04(b).................................................................................18

Copyright Act............................................................................................................11

Lanham Act.........................................................................................................11, 17

**Other Authorities**

37 C.F.R. § 202 (2023) ............................................................................................. 14

Fed. R. Civ. P. 65(c) ................................................................................................ 25

13-65 Moore's Federal Practice - Civil § 65.50 ....................................................... 25

Rule 9(b) ................................................................................................................... 17

# I.    INTRODUCTION

By its own admission, Daybreak waited somewhere between six and eight months to seek a preliminary injunction against The Heroes' Journey ("THJ"). That delay alone is all but fatal to the requested extraordinary remedy. Even worse, Daybreak's papers leave the impression that THJ engaged in never-before-seen malicious conduct and intellectual property infringement on a breathtaking scale. That is false. THJ is an emulator, and what Daybreak *never* mentions in hundreds of pages is that Daybreak (and its predecessors) have known that EverQuest ("EQ") emulators, like THJ, have been engaged in the *exact same conduct* for more than *two decades* without Daybreak or its predecessors taking any action to stop the alleged intellectual property infringement. More than that, Daybreak and its predecessors have affirmatively encouraged the existence of *thousands* of such emulators both through inaction and through public statements in support of them. Why? Because EQ has benefited from emulators. Emulators like THJ have improved and enriched the broader EQ community, have increased viability of the EQ game, have served as incubators for future EQ expansions, and have kept players active in EQ when EQ itself may be (or has been) stagnant.

Almost since inception, EQ has operated simultaneously with thousands of emulators, like THJ, who have created their own unique, unrelated servers that provide fundamentally different experiences otherwise unavailable on the EQ game. Emulators create their own servers with unique stories, mechanics, and gameplay. Like nearly *every other emulator*, THJ used EQEmulator's open-source code to create its own server and then directed an obsolete (decommissioned) EQ client to that server.

THJ has not used Daybreak's intellectual property any more than thousands of other EQ emulators have done for over twenty-five years *without objection (and often with encouragement) from Daybreak and its predecessors*. Having waited decades to take action, Daybreak's claims are barred by both equitable estoppel and laches.

After allowing, encouraging, and benefiting from emulators for twenty-five years, Daybreak has decided that this *particular* emulator has caused a drop in its users and

revenue so extreme that a preliminary injunction is justified. Although Daybreak may be facing declining numbers, there are serious flaws with the factual underpinning of Daybreak's claim that THJ—and not Daybreak's own failures—is to blame. A declining player base caused by *Daybreak* fails to establish irreparable harm to justify enjoining *THJ*. Daybreak offers no proof beyond mere speculation that its goodwill and reputation will be damaged by THJ's alleged infringement, even while ignoring that whatever harm emulators might do to its intellectual property has already been happening for decades. And Daybreak now improperly seeks to obtain its ultimate remedy, pre-merits, by requesting a mandatory injunction that would not restore the status quo, but would upend it, by effectively eliminating THJ.

## II.    BACKGROUND

### A. The Twenty-Five Year History and Relationship Between EverQuest and Emulators

Released in 1999, EQ is a fantasy-themed, massively multiplayer online role-playing game ("MMORPG") that was developed by Verant Interactive and co-created by John Smedley, the former President of Sony Online Entertainment ("SOE," Daybreak's predecessor). Over the years, EQ evolved, and its servers changed how players could interact with the game, which included mechanical, story, gameplay, and feature changes. Declaration of Kristopher Takahashi ("Takahashi Decl.") ¶ 10.

In 2001, a frustrated EQ player, who preferred previous EQ gameplay and mechanics that were no longer available in the current version of EQ, started a project to generate original, independently developed source code that could be used to create an entirely different server to replace, or "emulate," the EQ servers. *Id.* ¶ 11. This led to the development of the EQEmulator ("EQEmu"), which is open source, fan-written, clean-room reversed engineered source code that has been publicly available online since early 2001. *Id.* ¶ 12. Since EQEmu's inception, it has been downloaded countless times, and the installation has been completed more than 28,000 times. *Id.* ¶ 14.

To function, these EQEmu servers, including THJ, have always required players

---

1  to create an EQEmu account (which is not affiliated with Daybreak) and to obtain (on

2  their own) an obsolete but *authentic* EQ client. *Id.* ¶ 24. The players then point the client

3  to EQEmu login servers (which exist entirely separate from, and are unrelated to,

4  Daybreak's servers), and log in using their EQEmu credentials. *Id.* They then play in the

5  emulator's unique environment, which is entirely unconnected to the EQ servers and

6  that environment. In short, EQ and EQEmu emulators (like THJ) require different

7  accounts because *EQ accounts and servers do not work with EQEmu accounts or*

8  *servers, nor will EQEmu accounts and servers work with EQ accounts or servers.*

9       Over the years, EQEmu servers have kept the EQ community active and engaged

10  between EQ expansions. *Id.* ¶ 30. According to former EQ Producer Jeff Butler, "good-

11  faith fan emulators, like THJ, enrich the historical legacy of classic MMOs, foster

12  creativity, and do not constitute market substitution for any existing or planned official

13  servers." Declaration of Jeff Butler ("Butler Decl.") ¶ 26. Consistent with that view, in

14  2015, Daybreak formally acknowledged and entered into an agreement with Project

15  1999, the largest and most notable EQEmu at the time, to allow it to continue operating.

16  *See* Ex. 3. This agreement recognized Project 1999 as "a fan based, not-for-profit, classic

17  EverQuest emulation project." *Id*. As EQ's co-creator, John Smedley, remarked, "I never

18  want to paint these emulator guys as anything but our number one fans and the hardest

19  working people I've ever met*. Thus, to be able to support it officially like we have, it

20  makes me feel good." Takahashi Decl. ¶ 31(b) and Ex 4. Until this lawsuit, Daybreak

21  had always done just that—supported EQ's "number one fans," the thousands of

22  emulators.

23  **B. The Heroes' Journey Development and Another Quest LLC**

24       Launched in October of 2024, THJ is just one of the thousands of fan servers that

25  have used EQEmu's open source, fan-written, clean-room engineered source code to

26  create their own servers with unique stories, mechanics, and gameplay systems. *Id.* ¶ 24.

27  "Neither Another Quest LLC nor its members recreated the client-server architecture,

28

1
2
character systems, or user interface of EQ."[1] Declaration of Zack Karlsson ("Karlsson Decl.") ¶ 36.

3
4
5
6
7
8
9
10
11
12
Since THJ's inception, Defendants have made hundreds of thousands of edits to the EQEmu database, and tens of thousands of lines of code in scripts, in pursuit of a fully customized and original gameplay experience. Declaration of Alexander Taylor ("Taylor Decl.") ¶ 10. These developments represent Defendants' original ideas, content, code, and data. Takahashi Decl. ¶ 41. Defendants made these developments under the reasonable belief they would be allowed to exist, if not be encouraged, as prior emulators had been for decades. *Id.* This belief was based on statements of acceptance and support for emulators made by Daybreak and its most senior executives, *id.* ¶ 31, as well as the knowledge that thousands of other EQEmu servers came into existence over the last two decades without objection from Daybreak or its predecessors. *Id.* ¶ 41.

13
## III.   STANDARD OF REVIEW

14
15
16
17
18
19
20
21
22
23
24
"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). "The grant of a preliminary injunction is the exercise of a very far reaching power never to be indulged in except in a case clearly warranting it," and "[o]n application for preliminary injunction the court is not bound to decide doubtful and difficult questions of law or disputed questions of fact." *Mayview Corp. v. Rodstein*, 480 F.2d 714, 719 (9th Cir. 1973) (citation omitted). Given its drastic nature, "[t]he existence of any debate or doubts on the record as to the merits of the claim or the power of the court to act will ordinarily bar the granting of a preliminary injunction." *Sid Berk, Inc. v. Uniroyal, Inc.*, 425 F. Supp. 22, 29 (C.D. Cal. 1977).[2] In other words, "[t]o doubt is to deny." *Pollution Denim & Co. v. Pollution Clothing Co.*, 547 F. Supp. 2d 1132, 1143 (C.D. Cal. 2007) (citations omitted).

25
26
27
[1] Mr. Karlsson is the only person who served as a "fully-privileged administrator to both EQ and THJ, affording [him] unique insight into the structural and fundamental differences between EQ and THJ." Karlsson Decl. ¶ 14.

28
[2] This applies with even greater force in copyright infringement cases because a "difficulty of predicting the merits of a copyright claim at a preliminary injunction

As is sought by Daybreak here, a "mandatory injunction 'goes well beyond simply maintaining the status quo *pendente lite* [and] is particularly disfavored.'" *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (quoting *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1979)). In seeking a mandatory injunction, Daybreak's burden is "doubly demanding," and such a request should be denied unless "the law and facts *clearly favor* [its] position, not simply that [it] is likely to succeed." *Garcia v. Google Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (emphasis in original).

## IV.    ARGUMENT

### A. Daybreak's Request for Mandatory Injunctive Relief Should Be Denied.

Daybreak's requested injunction goes well beyond returning to the status quo. The status quo for nearly a year was THJ operating an emulator, and the status quo for over *twenty years* was emulators like THJ freely operating in the EQ community. Yet Daybreak seeks an injunction prohibiting Defendants (through Another Quest LLC) from operating its own servers, website, and even maintaining repositories of its own source code and software. Mot. at 31. In other words, from existing at all.

Because Daybreak thus seeks to compel Defendants "to take action," *Garcia*, 786 F.3d at 740, the requested injunction is mandatory in nature. *See Battelle Energy All., LLC v. Southfork Sec., Inc.*, 980 F. Supp. 2d 1211, 1216 (D. Idaho 2013) (injunction requiring defendants to remove source code from the internet was mandatory because defendants had released the software "three months before th[e] lawsuit was filed," and the injunction would require "defendants to do something that will change the status quo"); *see also DealDash Oyj v. ContextLogic Inc.*, 2018 WL 3820654, at *6 (N.D. Cal. Aug. 10, 2018) (injunction "requiring defendant to issue a mandatory update for previously distributed apps" was mandatory because it "would not simply preserve the status quo, but would require defendant to take action" in the form of building new application tools and messaging) (internal quotation marks omitted)).

---

hearing"— a "difficulty [that] is compounded significantly when a defendant raises a colorable fair use defense." *Salinger v. Colting*, 607 F.3d 68, 80-81 (2d Cir. 2010).

1    Even more problematic, the mandatory relief sought here would effectively grant
2    Daybreak full and final relief on its claims by completely shuttering THJ. The Ninth
3    Circuit has rejected preliminary injunctions seeking "judgment on the merits in the guise
4    of preliminary relief" and called them "highly inappropriate." *See Senate of State of Cal.*
5    *v. Mosbacher*, 968 F.2d 974, 978 (9th Cir. 1992).

6    **B. Daybreak Cannot Show a Substantial Likelihood of Success on the Merits.**

7    Daybreak does not and cannot show a likelihood of success on the merits
8    sufficient to support a preliminary injunction, let alone the "doubly demanding"
9    mandatory injunction standard that the "law and facts *clearly favor* [its] position."
10   *Garcia*, 786 F.3d at 740 (emphasis in original). Further, "[t]he requirement that the
11   plaintiff show a likelihood of success on the merits means that the plaintiff must
12   demonstrate that . . . it will prevail on any affirmative defense as well as on plaintiff's
13   case in chief." *Authen Tec, Inc. v. Atrua Techs.*, *Inc.*, 2009 WL 765144, at *2 (N.D. Cal.
14   Mar. 19, 2009). No such showing has been or can be made here.

15   **1.    Equitable Estoppel Bars Daybreak's Claims.**

16   "[T]he doctrine of estoppel may bar the copyright owner's claims completely,
17   eliminating all potential remedies." *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S.
18   663, 684 (2014) (citation omitted). THJ is not doing anything with Daybreak's
19   intellectual property that *thousands* of emulators have not already done for more than
20   two decades with the consent—both implicit (through decades of silence) and explicit
21   (through outright endorsements and encouragement)—of Daybreak and its predecessors.
22   Equitable estoppel therefore bars Daybreak's claims.

23   Equitable estoppel applies when four elements are met: "(1) [t]he party to be
24   estopped must know the facts; (2) [it] must intend that [its] conduct shall be acted on or
25   must so ac that the party asserting estoppel has a right to believe it is so intended; (3) the
26   [defendant] must be ignorant of the true facts; and (4) [the defendant] must rely on the
27   [plaintiff's] conduct to [its] injury." *Hampton v. Paramount Pictures Corp.*, 279 F.2d

28

100, 104 (9th Cir. 1960). Because each element is met here, Daybreak's claims against THJ are therefore barred in their entirety.

### a. Daybreak and Its Predecessors Knew About EQ Emulators, Like THJ, for Decades and Did Nothing.

There is no dispute that Daybreak and its predecessors knew the facts of the allegedly infringing conduct for more than two decades, or at least since the early 2000s. Yet until this lawsuit, Daybreak (and its predecessors) neither raised any copyright issues nor pursued any legal action against any emulator. Witnesses that were at EQ from the beginning confirm these facts. *See* Butler Decl. ¶ 10 ("During my time at EverQuest, emulators of the EverQuest server were well-known to me and the team at SOE" but they "chose not to pursue any enforcement activity against emulators."); Karlsson Decl. ¶ 8 ("[W]e learned about EverQuest emulator projects early on. Very quickly, it became clear that we wanted to support their efforts" because emulators are made by "die-hard EQ fans who would bring energy, creativity, and longevity to the larger EQ community"); *id.* ¶ 9 ("I am aware of no prior lawsuits. I am aware of no takedown notices. I had not even seen a sternly worded blog post from Daybreak about emulators.").

Nor has EverQuest attempted to stop EQEmu, as confirmed by its "lead developer and a core maintainer." Declaration of Chris Miles ("Miles Decl.") ¶ 2. "In all my years leading and working on EQEmu, I have never seen or heard of any attempt by Daybreak Games or Sony Online Entertainment to shut the project down." *Id.* ¶ 44. The evidence shows that Daybreak and its predecessors knew about Project EQEmu—and the thousands of emulators that have operated in the same manner as THJ—but never gave any indication that it felt these emulators were improper.

### b. For Decades, Daybreak and Its Predecessors Created an Impression They Were Acceptable.

Beyond mere inaction, however, Daybreak and its predecessors also publicly encouraged emulators for decades, creating the impression of acceptance. *See Id.* ¶¶ 13–

15 ("several original EverQuest developers and staff have expressed understanding and support for EQEmulator's existence"). Examples of Daybreak and its most senior executives making supportive and encouraging statements about emulators (like THJ) include:

- On April 29, 2015, Daybreak posted a message from Project 1999 announcing that, "[Project 1999] have recently entered into a written agreement with Daybreak Game Company LLC that formally recognizes Project 1999 as a fan based, not-for-profit, *classic EverQuest emulation project*. The agreement establishes the guidelines that we as a project must follow, but it *will allow to us (sic) continue to update the game without risk of legal repercussions*." *See* Takahashi Decl. ¶ 31(a) and Ex. 3.

- On May 5, 2015, then Sony's (Daybreak's Predecessor) President and co-creator of EQ, John Smedley, said, "I never want to paint these emulator guys as anything but our number one fans and the hardest working people I've ever met. *So to be able to support it officially like we have*, it makes me feel good." *See id.* ¶ 31(b) and Ex. 4.

- On January 4, 2016, Smedley confirmed a "well known secret" that Daybreak held a favorable view of emulators, saying, "Truth is I've always respected the hell out of people that work on emulator stuff. Good for them. . . *Anyone that has that type of passion* and backwards engineers a server *is someone I respect highly*." *See id.* ¶ 31(c) and Ex. 5.

- On March 12, 2019, when speaking about EQ servers (like THJ), Daybreak's Then-Executive Producer Holly Longdale stated, "*We have more players now* than we did in 2015 *and our revenue has gone up*. *And that's thanks to these servers* [ie., THJ and other emulators]." *See id.* ¶ 31(d) and Ex. 6.

Over the many years, a status quo emerged: Daybreak operated the EQ game through the EQ servers using only the most current client, while "EQEmu servers operated independently [] using their own emulated server and an obsolete EQ client to provide unique experiences that were largely unavailable on EQ." *See* Takahashi Decl. ¶ 32; Karlsson Decl. ¶ 9 ("[T]housands of other emulated servers have existed with

1 Daybreak's knowledge and, at minimum, passive approval for over two decades."). 
2 Daybreak's statements about emulators and its failure to pursue legal action created an 
3 impression that emulators were acceptable. This merits the application of estoppel.

### c.   Daybreak's Inaction and Public Statements Gave Defendants Reasonable Impression Emulator Conduct Was Acceptable.

Daybreak's affirmative support and failure to raise any intellectual property concerns with emulators led Defendants to reasonably infer that it could develop THJ— just as emulators have done for decades. *See* Takahashi Decl. ¶¶ 28-31 (showing Daybreak's awareness, acceptance, and encouragement of emulators since its inception).

These decades of conduct were sufficient to justify Defendants' reliance. *See Oracle Am., Inc. v. Terix Comput. Co., Inc.*, 2015 WL 1886968, at *3–4 (N.D. Cal. Apr. 24, 2015) (finding equitable estoppel adequately alleged where "Oracle discovered Terix's allegedly infringing behavior, notified Terix that its conduct was improper, but then took no further steps to stop Terix," explaining that Oracle's "inaction suggested to Terix that Oracle no longer thought that Terix was doing anything unlawful, and Terix continued to build its business accordingly"); *see also Robbins v. Lee*, 2006 WL 8444872, at *5 (C.D. Cal. Sept. 29, 2006) (affirming holding that plaintiff was "equitably estopped from asserting a copyright infringement claim" where plaintiff caused the defendant to believe he was permitted to use the copyrighted works).

### d.   Defendants Detrimentally Relied on Daybreak's Conduct.

THJ built its entire business in reliance on Daybreak's explicit approval of emulators and years of silence. *See* Takahashi Decl. ¶¶ 37–43 (describing the development of THJ in reliance of Daybreak's acceptance of emulators); Taylor Decl. ¶ 5. Defendants "invested thousands of hours in developing extensive *original* systems, databases, and mechanical changes based around the EQEmu server framework," which it would have never done "if [Defendants] had known that Daybreak would turn its back on an over twenty-year history of peaceful co-existence with emulators." Takahashi Decl. ¶¶ 40, 49.

---

1   The facts here resemble *Field v. Google Inc.*, 412 F. Supp. 2d 1106 (D. Nev.
2   2006). There, Field "knew of Google's allegedly infringing conduct well before any
3   supposed infringement" occurred, yet "chose to remain silent knowing that Google
4   would automatically interpret that silence as permission" to continue its supposed
5   infringement. *Id.* at 1116–17. Field "could have informed Google" to stop its conduct,
6   but nevertheless remained silent. *Id*. at 1117. Google was therefore unaware of Field's
7   intentions and detrimentally relied on Field's apparent acquiescence. *Id*. The court found
8   Field was equitably estopped from asserting a copyright claim. *Id*.

9       Like in *Field*, Daybreak had full knowledge of the material facts and failed to take
10  any action for decades, meriting equitable estoppel of its copyright claims.

11          **2.    Laches Bars Plaintiff's Claims, at Least for Injunctive Relief.**

12      Because Daybreak has waited so long, and been so lax, it has lost its right to sue
13  emulators such as THJ—and at a minimum has waived its right to seek injunctive relief.
14  Under the doctrine of laches, a suit seeking equitable relief will be barred if the defendant
15  establishes "both an unreasonable delay by the plaintiff and prejudice to itself,"
16  *Evergreen Safety Council v. RSA Network, Inc.*, 697 F.3d 1221, 1226 (9th Cir. 2012),
17  and "[t]he bare fact of delay creates a rebuttable presumption of prejudice," *Int'l Tel. &*
18  *Tel. Corp. v. Gen. Tel. & Elecs. Corp.*, 518 F.2d 913, 926 (9th Cir. 1975).

19              **a.    Laches Bars the Requested Injunction for the Copyright Claim.**

20      Based on Daybreak's extraordinary delay, the doctrine of laches bars its claim
21  for injunctive relief against alleged copyright infringement. *See Petrella v. Metro-*
22  *Goldwyn-Mayer, Inc.*, 572 U.S. 663, 685 (2014) (while laches cannot be invoked to bar
23  legal relief within a statute of limitations, "the consequences of a delay in commencing
24  suit may be of sufficient magnitude to warrant, at the very outset of the litigation,
25  curtailment of the relief equitably awardable"). As discussed above, Daybreak knew in
26  2015—and has known for the past decade—that emulator servers, like THJ, have been
27  and continue to be built using open source EQEmu code and operated with an obsolete
28  EQ client. Daybreak nonetheless slept through emulators' alleged copyright violations

1    for at least ten years and is now attempting to seek injunctive relief without even

2    attempting to make an excuse for its delay. *See Danjaq LLC v. Sony Corp.*, 263 F.3d

3    942, 951 (9th Cir. 2001) (rejecting a copyright infringement action based on laches

4    where plaintiff chose "to sleep[] upon [their] rights" and delay suit for many years);

5    *see also Evergreen Safety Council*, 697 F.3d at 1228 (finding laches barred copyright

6    claim where plaintiff waited ten years and defendant had "a reasonable belief that the

7    infringer possesses a license or implied license"). Thus, Daybreak's claims for

8    injunctive relief for alleged violations of the Copyright Act are time-barred.

9                    **b.    Laches Bars Plaintiff's Trademark Claims.**

10           Daybreak's unreasonable delay in asserting its purported trademark and trade

11   dress claims against emulators like THJ constitutes laches. A "[f]inding that laches bars

12   a trademark claim is appropriate where the trademark holder knowingly allowed

13   the infringing mark to be used without objection for a lengthy period of time." *Eat Right*

14   *Foods Ltd. v. Whole Foods Mkt., Inc.*, 880 F.3d 1109, 1115 (9th Cir. 2018) (internal

15   quotation marks and citation omitted). "The bare fact of delay creates a rebuttable

16   presumption of prejudice." *Int'l Tel. & Tel. Corp.*, 518 F.2d at 926.

17           In such cases, if the most analogous statute of limitations has run, "there is a strong

18   presumption in favor of laches." *See Pinkette Clothing, Inc. v. Cosmetic Warriors Ltd.*,

19   894 F.3d 1015, 1025 (9th Cir. 2018). Since the most analogous state statute of limitations

20   for a Lanham Act claim is California's four-year statute of limitations for trademark

21   infringement actions, THJ is entitled to a "strong presumption" in favor of laches. *Id.*

22           After that, the Court should consider the six equitable factors set forth in *E-*

23   *Systems, Inc. v. Monitek, Inc.*, 720 F.2d 604, 607 (9th Cir. 1983), namely, (1) the strength

24   of the asserted mark; (2) plaintiff's diligence in enforcing the mark; (3) harm to the

25   plaintiff; (4) good faith or ignorance by the junior user; (5) competition between senior

26   and junior users; and (6) the extent of harm suffered by the junior user because of the

27   senior user's delay. These factors support laches here.

28           First, the "strength and value of the trademark rights asserted" clearly supports

laches. Whatever use Daybreak alleges THJ is making of its trademarks has been allowed to occur across thousands of emulators for years. *See Am. Int'l Grp., Inc. v. Am. Int'l Bank*, 926 F.2d 829, 834 (9th Cir. 1991) (Kozinski, J., dissenting) ("Companies expecting judicial enforcement of their marks must conduct an effective policing effort."). This lack of "diligence in enforcing the mark" means the second element also weighs heavily in Defendants' favor. *See Harman Int'l Indus., Inc. v. Jem Accessories, Inc.*, 668 F. Supp. 3d 1025, 1042 (C.D. Cal. 2023) ("fail[ure] to contact [defendant] about the alleged infringement prior to filing [suit] … falls short of the 'effective policing effort' the Ninth Circuit requires"). Emulators began operating in the early 2000s. No owner of EQ complained about it until 2025, which falls well short of the required "effective policing." *See Grupo Gigante SA de CV v. Dallo & Co.*, 391 F.3d 1088, 1102 (9th Cir. 2004) (finding lack of diligence where plaintiff contacted defendant three times over four years); Karlsson Decl. ¶ 9. Third, there is no additional harm to Daybreak if relief is denied because thousands of emulators are and have engaged in like conduct for decades. Fourth, there was "good faith ignorance by the junior user" here because, to the extent THJ uses the marks, it has done no more than other emulators have done for decades. Fifth, the existence of "competition between senior and junior users" is minimal at best: THJ (and other emulators) function independently and provide unique experiences that were largely unavailable on EQ, whereas Daybreak operates EQ. Sixth, the extent of harm that THJ has suffered because of Daybreak's delay is substantial. *See* Takahashi Decl. ¶ 41 (describing the thousands of hours in developing extensive original systems, database, and mechanical changes).

### 3.    Plaintiff Cannot Show a Likelihood of Success on Its Claims.

#### a.    Daybreak Fails to Adequately Plead Direct or Vicarious Copyright Infringement.

To establish a successful claim for copyright infringement, Daybreak must prove (1) ownership of a valid copyright, and (2) copying of a protectable expression by THJ. *Baxter v. MCA, Inc.*, 812 F.2d 421, 423 (9th Cir. 1987). Absent direct evidence of

1 copying, Daybreak must further establish (1) THJ's access to the copyrighted work, and

2 (2) substantial similarity between both the ideas and the expression of those ideas. *Id.*

3       Plaintiff cannot meet this standard, as Defendants did not copy, modify, or

4 otherwise use any of EQ's source code or protected expressions. THJ was built using

5 EQEmu's fan-written, clean-room, reverse engineered, open-source code, not

6 Daybreak's server code. EQEmu specifically avoided the use of EQ's proprietary server

7 code and client assets in developing its server code. Miles Decl. ¶¶ 7, 9, 12; Karlsson

8 Decl. ¶¶ 22, 36. Reverse engineering is a widely accepted, lawful method of software

9 development that courts have recognized as a valid defense to infringement. *See Sega*

10 *Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1520 (9th Cir. 1992) (finding reverse

11 engineering of a program fair use where "disassembly is the only means of gaining

12 access to those unprotected aspects of the program"); *Sony Comput. Ent., Inc. v.*

13 *Connectix Corp.*, 203 F.3d 596, 603–08 (9th Cir. 2000) (same for emulators, even

14 though defendant's product would cause Sony to "lose console sales and profits").

15       Nor does THJ reproduce or display EQ's copyrighted visuals. Plaintiff's claims

16 rest on the faulty premise that any use of an emulator constitutes direct or induced

17 infringement and rely upon comparisons of the artwork between EQ and THJ, including

18 character animations and drawings.[3] *See* Mot. at 11-12, 16-17. Absent evidence that the

19 emulator itself contains infringing source code or that Defendants used Plaintiff's

20 protected expressions in the THJ server, there is no plausible basis for a finding of

21 infringement. Indeed, Plaintiff's own expert Garry Kitchen acknowledged in a prior

22 report that parties, like Daybreak, cannot "rely on these visual elements to support a

23 claim of infringement or misappropriation of its actual source code," *see* Exhibit 43,

24 *Lilith Games (Shanghai) Co. Ltd. v. uCool, Inc.*, No. 5:15-cv-01267, Dkt. 69-16

25 (Declaration of Kitchen) ¶ 61, and "to the extent that these comparisons may create the

26 _____
[3] Defendants merely enable users to connect their own EQ game clients to the EQEmu-

27 based emulator without copying or using any EQ source code or client assets. Any character design or other visual allegedly reproduced by THJ is stored in EQ's own

28 client, which Defendants have not modified or copied in any way. *See* Karlsson Decl. ¶¶ 18, 36.

1
2
3

erroneous assumption that similarities in artwork are indicative of similarities in underlying source code, this assumption is incorrect, such inferences are unfounded, and [Plaintiff's] arguments are misleading," *id.* ¶ 62. The same is true here.

4
5
6
7
8
9
10
11
12
13
14

Daybreak argues that Defendants violated its copyright by "modifying 234 of Daybreak's copyrighted files." Mot. at 15-16. But, of the 179 files detailed in Mr. Kitchen's report, at least 167 files (or approximately 93%) appear to have been generated through configuration processes or tools analogous to algorithmic processes or AI that lack the human authorship required for copyright protection, which extends only to expressive, original, human-authored content. *See* Karlsson Decl. ¶¶ 89-90; Copyright Registration Guidance: Works Containing Material Generated by Artificial Intelligence, 37 C.F.R. § 202 (2023) ("When an AI technology determines the expressive elements of its output, the generated material is not the product of human authorship."). This raises serious doubts as to the viability of any copyright claim based on modifications of such basic files, particularly where they are also likely transformative.

15
16
17
18
19
20
21
22
23
24
25

Even where a defendant has prima facie infringed one of the Section 106 rights by creating a "substantially similar" copy or derivative work, Section 107 of the Act provides that "the fair use of a copyrighted work . . . is not an infringement of copyright." 17 U.S.C. § 107. It is fair use to create "wholesale cop[ies] of [a work] as a preliminary step" to develop a new, non-infringing product, even if the new product competes with the original. *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1527 (9th Cir. 1992); *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 19 (2021) (fair use to replicate copyrighted software programming interfaces to create a new mobile platform). Thus, even if Daybreak could argue copyright infringement is applicable, Defendants' alteration of a handful of rudimentary files in creating its own original content is protected by the fair-use doctrine.

26

### b.  Daybreak Fails to Adequately Plead a Violation of the DMCA.

27
28

Daybreak's claim that THJ violated Section 1201(a)(1) of the DMCA by "circumventing" a "technological measure that effectively controls access" will fail as a

1  matter of law because all the technological measures in question protect the Daybreak

2  servers, and THJ never even attempts to access those servers. *See* Karlsson Decl. ¶ 50

3  ("THJ does not interact with Daybreak's authentication servers, database systems, or

4  backend tools in any capacity. It does not override or bypass their login systems nor

5  simulate, fake, nor misrepresent their subscription services."); Taylor Decl. ¶ 18.

6      To prevail under the DMCA's anti-circumvention provisions, Plaintiff must show

7  that Defendants: (1) circumvented a technological measure that effectively controls

8  access to a protected work, and (2) did so without authorization and for an infringing

9  purpose or outside a statutory exception. *See MDY Indus., LLC v. Blizzard Ent., Inc.*,

10  629 F.3d 928, 944 (9th Cir. 2010). Daybreak can make no such showing. Daybreak's

11  measures protect the *Daybreak* servers, not the *EQEmu* servers. THJ and other emulators

12  *never even attempt to connect to Daybreak's servers*. There can thus be no

13  circumvention of technological protections of the Daybreak server.

14          **c.    Plaintiff's Trademark Infringement Claims Also Fails.**

15      Daybreak asserts two separate claims for trademark infringement—one under the

16  Lanham Act (15 U.S.C. §§ 1125(a)) and one under California common law—all based

17  on THJ's purported "use" of Plaintiff's trademark. Neither of these claims succeeds,

18  however, because Daybreak cannot sufficiently show a likelihood of confusion. "The

19  core element of trademark infringement is…whether the similarity of the marks is likely

20  to confuse customers about the source of the products." *Brookfield Commc'ns, Inc. v.*

21  *W. Coast Ent. Corp.*, 174 F.3d 1036, 1053 (9th Cir. 1999) (citation and internal quotation

22  marks omitted).

23          **(i)    Daybreak Cannot Show a Likelihood of Confusion.**

24      Daybreak's trademark infringement claims ask whether the defendant's use of the

25  mark on competing or related goods creates a likelihood of consumer confusion. *See*

26  *Ketab Corp. v. Mesriani & Assocs., P.C.*, 734 F. App'x 401, 407 (9th Cir. 2018) ("the

27  crucial issue is whether the defendant's use of the plaintiff's mark or trade name creates

28  a likelihood of confusion for the public"). "The test for likelihood of confusion is

whether a reasonably prudent consumer in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1140 (9th Cir. 2002) (internal quotation marks and citation omitted); *see Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 677 (9th Cir. 2005) ("[T]rademark infringement protects only against mistaken *purchasing decisions* and not against confusion generally." (citation omitted) (emphasis in original).

Although Daybreak is quick to declare that "confusion is evident based on Defendants' direct copying of EverQuest's Trade Dress," it cites no evidence in support of this statement. *See ArcSoft, Inc. v. CyberLink Corp.*, 153 F. Supp. 3d 1057, 1071 (N.D. Cal. 2015) ("the risk of such harm must be established by specifically relevant evidence, not by 'platitudes' or evidence that merely 'underscores customer confusion.'") (citing *Herb Reed*, 736 F.3d at 1250)). Nor could it. All players understand that THJ is one of thousands of fan-made projects that have used EQEmu to create their own server with unique stories, mechanics, and gameplay systems. Takahashi Decl. ¶ 24. Consumer confusion between EQ and THJ is not credible, especially where the same alleged use has been happening with thousands of other emulators for two decades. As former EQ Producer Jeff Butler said, "We believed the emulator projects posed no risk of consumer confusion; they never claimed to be [Daybreak's Predecessor], and we saw no plausible likelihood that our subscribers—or prospective subscribers—would mistake those unofficial servers for the official EverQuest service." Butler Decl. ¶ 12 ("[former EQ employees'] believed the emulator projects posed no risk of consumer confusion"); Taylor Decl. ¶ 25 ("EQEmu and THJ players aren't confused about the distinction between emulators and EQ").

### (ii)    Daybreak's UCL Claims Fails.

Daybreak's common law unfair competition claim fails because it is premised on the same conduct underlying its deficient false designation of origin claim. When the underlying claim that supports a UCL claim fails, "so too will the [] derivative UCL claim." *Yellowcake, Inc. v. Hyphy Music, Inc.*, 2021 WL 3052535, at *13 (E.D. Cal. July

20, 2021); *Eidmann v. Walgreen Co.*, 522 F. Supp. 3d 634, 647 (N.D. Cal. 2021) (same).

Daybreak's UCL claim also fails because Daybreak has not established that its lacks an adequate legal remedy. "Remedies under the UCL are limited to restitution and injunctive relief, and do not include damages." *Silvercrest Realty, Inc. v. Great Am. E&S Ins. Co.*, 2012 WL 13028094, at *2 (C.D. Cal. Apr. 4, 2012). To state a viable claim for "equitable restitution for past harm under the UCL," a plaintiff "must establish that she lacks an adequate remedy at law." *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020) (affirming dismissal where plaintiff failed to allege an inadequate legal remedy). Here, Daybreak has not shown that no adequate legal remedy exists.[4]

### d.    Daybreak Fails to State a Claim for Breach of Contract.

Daybreak's bad-faith inducement is a basis to estop it from asserting its claims for breach of the EULA[5] due to its past statements of support for emulators as well as its failure to take any action against emulators for the conduct about which it now complains. *See, e.g.*, *Quest Software, Inc. v. DirecTV Operations, LLC*, 2011 WL 4500922, at *5 (C.D. Cal. Sept. 26, 2011) ("[A] plaintiff will be estopped from asserting a breach of contract claim if he aids or induces a breach.").

---

[4] Daybreak's false association claim also fails because it is grounded in fraud but was not plead with sufficient detail to meet Rule 9(b). As such, it must comply with the requirements of Rule 9(b) for pleading fraud with particularity. *See Smoothreads, Inc. v. Addventure Prods., Inc.*, 2009 WL 10671911, at *7 (S.D. Cal. Sept. 29, 2009) ("A claim [under 1125(a) of Lanham Act] is not exempt from the strictures of [Rule 9(b)].").

[5] Defendants intend to file a motion to stay on or before August 15, 2025 pursuant to Daybreak's End User License Agreement, which mandates arbitration for "any controversy, claim or dispute arising out of or relating to this Agreement *or* any aspect of the relationship between [Defendants] and Daybreak. . ." Even assuming *arguendo* that some portion of Daybreak's claims might eventually return to this Court, a stay is nonetheless warranted because arbitration is likely to "decide issues that will … streamline subsequent [judicial] proceedings" or at least "bear … on the court's ultimate disposition" of any non-arbitrable portion of the case. *Armstrong v. Michaels Stores, Inc.*, 2018 WL 6505997, at *14 (N.D. Cal. Dec. 11, 2018).

---

1

### 4.    Daybreak's Complaint Names Improper Defendants.

2     Daybreak fails to justify bringing suit against the members of the LLC operating
3   THJ rather than the LLC itself (Another Quest LLC). A member or manager of an LLC
4   cannot be held liable for the "debts, obligations, or other liabilities" of the LLC,
5   "whether arising in contract, tort, or otherwise," solely by reason of his status as a
6   member or manager. Cal. Corp. Code § 17703.04(a); *see Sonora Diamond Corp. v.*
7   *Superior Court*, 83 Cal. App. 4th 523, 538 (2000) ("Ordinarily, a corporation is regarded
8   as a legal entity, separate and distinct from its stockholders, officers and directors, with
9   separate and distinct liabilities and obligations." (citations omitted)).

10     An LLC member may only become liable in limited circumstances for the LLC's
11   obligations under California's common law alter-ego doctrine. Cal. Corp. Code §
12   17703.04(b). Specifically, alter ego liability permits a plaintiff to pierce the corporate
13   veil only "where an abuse of the corporate privilege justifies holding the equitable
14   ownership of a corporation liable for the actions of the corporation." *Sonora Diamond*,
15   83 Cal. App. 4th at 538 (citation omitted). Under California law, two requirements must
16   be met to invoke the alter ego doctrine: "(1) that there be such a unity of interest and
17   ownership that the separate personalities of the corporation and individual no longer
18   exist, and (2) that, if the acts are treated as those of the corporation alone, an inequitable
19   result will follow." *See Mesler v. Bragg Mgmt. Co.*, 216 Cal.Rptr. 443, 448 (1985) (en
20   banc). No such showing has been or can be made by Daybreak.

21   ### C. Daybreak Will Not Suffer Irreparable Harm If the Motion Is Denied.

22     Daybreak fails to meet its heavy burden of showing any specific and imminent
23   harm for several reasons, and the Court should deny its Motion for that reason alone.
24   *See Wahoo Int'l, Inc. v. Phix Dr., Inc.*, 2014 WL 2106482, at *4 (S.D. Cal. May 20,
25   2014) ("Because the Court finds Plaintiff has failed to establish irreparable harm, the
26   Court need not address the remaining preliminary injunction prongs.").

27   ### 1.    Daybreak's Delay Rebuts Any Presumption of Irreparable Harm.

28     Daybreak simply waited too long to seek the extraordinary remedy of a

1
2
3

preliminary injunction, let alone one that would mandate completely shuttering THJ.  Its "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." *Miller v. Cal. Pac. Med. Ctr.*, 991 F.2d 536, 544 (9th Cir. 1993).

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19

Here, Daybreak waited ***nearly eight months, but at least six months***, before filing this motion. By Plaintiff's own admission, the absolute latest that it learned of THJ is in December 2024. *See* Janda Decl. ¶ 15; *Robinson v. Best Price Distributors, LLC*, 2023 WL 2203584, at \*4 (C.D. Cal. 2023) (affirming denial preliminary injunction based on six-month delay between discovery and filing, which "indicates that any harm, was not, in fact, irreparable"). Daybreak's delay in seeking preliminary relief rebuts any presumption of irreparable harm and is, by itself, grounds for denial. *Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) (affirming denial preliminary injunction based on delay alone because "Plaintiff's long delay . . . implies a lack of urgency and irreparable harm."). Courts have consistently held that delays of this length ***or less*** undercut claims of irreparable harm and are routinely grounds for preliminary injunction denials. *See, e.g.*, *Garcia*, 786 F.3d at 738 (five months); *AK Metals, LLC v. Norman Indus. Materials*, 2013 WL 417323, at \*9 (S.D. Cal. Jan. 31, 2013) (two months); *Thermogenesis Corp. v. Origen Biomedical, Inc.*, 2014 WL 4930678, at \*4 (E.D. Cal. Sept. 29, 2014) (seven months); *Zamfir v. Casperlabs, LLC*, 528 F.Supp.3d 1136, 1152 (S.D. Cal. 2021) (seven months).

20
21
22
23

Daybreak's unexplained delay in seeking a preliminary injunction—longer than the delays in many of the cases cited above—is fatal to Daybreak's attempt to demonstrate imminent irreparable harm and highlights both the lack of any urgency and absence of any impending risk.

24

### 2.     Daybreak Provides Insufficient Evidence of Irreparable Harm.

25
26
27

The burden is on Daybreak to proffer evidence of irreparable harm that is "real and significant, not speculative or remote," *Puma SE v. Forever 21, Inc.*, 2017 WL 4771003, at \*2 (C.D. Cal. June 2, 2017), and "unsupported and conclusory statements

28

1
2
regarding harm [plaintiff] might suffer" are insufficient to prove harm. *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013).

### a. Daybreak's Claimed Damage to Goodwill and Reputation Is Not Irreparable Injury.

Daybreak claims that THJ operating an emulator not controlled by Daybreak will "damage . . . Daybreak's reputation and goodwill in ways that cannot be quantified . . . ." Mot. at 26. But Daybreak "must adduce evidence of likely irreparable harm and may not rely on 'unsupported and conclusory statements regarding harm [it] *might* suffer.'" *Pom Wonderful LLC v. Pur Beverages LLC*, 2015 WL 10433693, at *5 (C.D. Cal. Aug. 6, 2015) (emphasis in original). That it has not done.

Fatal to Daybreak's claims that THJ threatens Daybreak's control of its goodwill is the simple fact that emulators have for decades been doing everything (and more) that THJ is doing. Having permitted thousands of emulators to engage in uncontrolled conduct Daybreak now alleges will damage its brand, Daybreak has effectively engaged in naked licensing on a massive scale. *See, e.g.*, *Barcamerica Int'l USA Tr. v. Tyfield Imps., Inc.*, 289 F.3d 589, 596 (9th Cir. 2002) ("where the licensor fails to exercise adequate quality control over the licensee, a court may find that the trademark owner has abandoned the trademark"). There, as here, where a party fails to enforce quality control, "the owner would be estopped from asserting rights to the trademark." *Id*. Whatever "goodwill" Daybreak wished to protect has long since been lost and cannot provide the basis for a claim of irreparable harm.

### b. Daybreak's Alleged Financial Peril Is Contradictory and Insufficiently Attributed to Defendants to Merit an Injunction.

Daybreak's purported "evidence" of irreparable harm is a self-serving declaration from its Executive Producer, Jennifer Chan, which is misleading, if not intentionally deceptive. At most, Chan's Declaration asserts what "may" or "could" happen. *See, e.g.*, Chan Decl. ¶ 35. The declaration is inherently speculative and should be disregarded.

Chan's characterizations of data purporting to quantify the business Daybreak has lost—both with regards to players and financials—should be viewed with skepticism. ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████ Chan Decl. ¶ 26, at EQ's height in 2020, as disclosed in a 2020 Investor Presentation, EQ reported having only 82,000 MAU, *see* Ex. 21. ███████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████ *See id.* ¶ 34. But even those numbers are misleading. ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████ Defendants believe that discovery will show a consistent decline in players ████████████████████ because—even prior to THJ's existence in October 2024—players have been migrating away from EQ for many years. *See* Karlsson Decl. ¶¶ 68-69, Ex. 20. Indeed, public data shows that EQ's player population dropped substantially in the months ***before*** THJ even launched and during a period when Daybreak banned thousands of players. *Id.*

Daybreak's claims of an "unprecedented decline" and "risks the collapse of its franchise" beginning in late 2024 are also inconsistent with sworn financial statements made by its parent company, Enad Global 7 ("EG7"). Those reported financials paint a vastly different picture. According to EG7's Swedish securities filings, for Q4 of 2024, "Daybreak's portfolio performed in line with expectations for the period, ***led by EverQuest***, which concluded a ***successful anniversary year*** with the release of two major content updates." *See* Karlsson Decl. ¶ 73, Ex. 23 (emphasis added). And critically, for Q1 of 2025 ███████████████████████████ EG7 told regulators, "EverQuest delivered a stable performance ***in-line with***

1    *expectations*, although slightly down compared to the ***exceptional results*** during last

2    year's anniversary celebrations."[6] *See* Karlsson Decl. ¶ 71, Ex. 22 (emphasis added).

3         Regardless, Chan's declaration is inherently speculative and fails to provide any

4    evidence suggesting a nexus between Daybreak's decline and the launch of THJ. *See*

5    *Suja Life, LLC v. Pines Int'l, Inc.*, 2016 WL 6157950, at \*11 (S.D. Cal. Oct. 24, 2016)

6    (where history of sales "fluctuated widely from year to year," 40% sales drop could be

7    attributed to other factors); *Dahl v. Swift Dist., Inc.*, 2010 WL 1458957, at \*11 (C.D.

8    Cal. Apr. 1, 2010) (plaintiff did not show "irreparable harm to his reputation and

9    goodwill" or loss of customers because he failed to provide "'data or evidence about

10   sales volume, sales margin, or the effects of sales made by [defendant]'"). Daybreak

11   does not, because it cannot, show that its claimed injuries were *caused* by Defendants'

12   actions rather than simply happening *contemporaneously* with them.

13        Far from tying any such injuries to Defendants, the evidence Daybreak itself relies

14   on suggests those injuries were likely due to its own business practices. The landscape

15   of consumer reviews of EQ in the time during and immediately leading up to this dispute

16   reveals that customers are not leaving EQ because of any conduct by Defendants, but

17   rather because of Daybreak's run of bad business decisions. *See* Karlsson Decl. ¶ 26,

18   Ex. 15. This includes the release of its only TLP of 2025, Fangbreaker, which was a

19   "catastrophic failure" that, from the moment it launched in May 2025, was

20   "overwhelmingly recognized by the player base as the worst server Plaintiff has ever

21   created." *See id.* ¶¶ 63, 66(a)-(i) (highlighting examples of immense community

22   discontent with Fangbreaker).

23        The theory that THJ is responsible for massive player losses at EQ does not mesh

24   with the facts. In his declaration, Mr. Taylor provides an in-depth analysis of which types

25   of players have active THJ accounts. *See* Taylor Dec. ¶¶ 19-25.  He notes, "[e]ven if the

26   assumption was made that every single player on THJ had been drawn from the EQ

27   ───────────────

28   [6] Given that such statements are governed by Swedish securities law and must be verified by the Board of Directors, they raise serious doubt as to the accuracy of Ms. Chan's financial impact claims.

playerbase, that total would fall far short of the number of players Daybreak asserts have been 'siphoned' from EQ to THJ. . . ." *Id.* at ¶ 26, ¶ 27 ("This assumption of mass migration from EQ to THJ would furthermore need to ignore the ample evidence to the contrary – that (a) the online population of EQEmulator is relatively unchanged over the lifespan of THJ, (b) THJ players are in no small part composed of those who were already not actively playing EQ, (c) it has been a normal pattern for EQEmulator to offer supplementary experiences for EQ players for decades, and (d) the EQ community was wildly discontented leading up to their most recent product release.").

Because Daybreak has presented nothing more than mere possibilities (particularly ones that do not hold up under scrutiny), it has failed to establish irreparable injury. *See Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474-75 (9th Cir. 1985) (declining to find irreparable harm based on four affidavits that were "conclusory and without sufficient support in facts"); *CycleBar Franchising, LLC v. StarCycle Franchise, LLC*, 2020 WL 3840442, at \*5 (C.D. Cal. Mar. 27, 2020) (finding that "conclusory and self-serving declaration[s]" constitute "weak evidence of irreparable harm" and insufficient for securing preliminary relief).

        **c.**    **Daybreak Provides No Evidence That Money Damages Are Insufficient.**

Even if Daybreak had come forward with evidence that players shifted from EQ to THJ, Daybreak would still have an adequate remedy in the form of money damages. *E.g.*, *Arcsoft, Inc. v. Cyberlink Corp.*, 153 F. Supp. 3d 1057, 1074-75 (N.D. Cal. 2015) ("[Plaintiff] fails to offer any persuasive explanation of how the decreases in downloads, users, and advertising sales are not properly characterized as economic injuries that can be remedied by monetary damages"). Daybreak's alleged injuries are economic in nature and thus sufficiently compensated through a monetary award. *See Goldie's Bookstore, Inc. v. Superior Ct. of State of Cal.*, 739 F.2d 466, 471 (9th Cir. 1984) (reversing grant of preliminary injunction when financial harm was "easily calculable and compensable in damages"); *Telephia, Inc. v. Cuppy*, 2005 WL 588441, at \*3 (N.D. Cal. Mar. 11, 2005)

("breach of contract can be compensated by money damages, and does not warrant the issuance of a preliminary injunction"). Daybreak fails to establish that it does not have an adequate remedy in money damages.[7]

### D. The Balance of the Equities Favors Denying Injunctive Relief.

To justify the extraordinary remedy of injunctive relief, Daybreak must show that the balance of equities tips "sharply" in its favor. *See Alliance for the Wild Rockies, Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). "An injunction should not be granted if its impact on the enjoined party would be more severe than the injury the moving party would suffer if it is not granted." *Litton Sys. Inc. v. Sundstrand Corp.*, 750 F.2d 952, 959 (Fed. Cir. 1984).

Daybreak's delay alone tips the equities in favor of THJ and against an injunction. *See, e.g.*, *Edge Games, Inc. v. Elec. Arts, Inc.*, 745 F. Supp. 2d 1101, 1118 (N.D. Cal. 2010) (a preliminary injunction would be "plainly inequitable and highly prejudicial" when the movant "could have" moved earlier but "waited 21 months to allow" the accused to "invest[] millions of dollars" and for its business to "develop and expand"). Further tipping the scales away from Daybreak, the harm THJ will suffer as a result of the injunction sought is extraordinary—it would render THJ nonexistent. *See Senate of State of Cal.*, 968 F.2d at 978 (denying preliminary injunction seeking "judgment on the merits in the guise of preliminary relief" and calling it "highly inappropriate").

### E. A Preliminary Injunction Does Not Favor the Public Interest.

Daybreak has not met its "initial burden of showing that [issuance of an] injunction is in the public interest." *Aurora World, Inc. v. Ty Inc.*, 719 F. Supp. 2d 1115, 1127 (C.D. Cal. 2009). Daybreak makes a circular argument that because "there is a public interest in upholding the protections afforded by copyright law," Mot. at 30, the

---

[7] Daybreak cites cases that it says show irreparable harm where damages were "not easily calculable or compensable." Mot. at 29. But, the difficulty in calculating alleged damages does not render them unavailable, nor does it prove irreparable harm. *Nutrition 21 v. United States*, 930 F.2d 867, 871 (Fed. Cir. 1991) ("[N]either the difficulty of calculating losses in market share, nor speculation that such losses might occur, amount to proof of special circumstances justifying the extraordinary relief of an injunction").

1    public will benefit from an injunction. But Daybreak does not establish a *prima facie*
2    case, neither in the Motion nor in its forty-one page complaint, that Defendants have
3    allegedly infringed on its copyright in ways different than any other emulator has done
4    for over two decades or established any consumer confusion.

5    Daybreak also disregards the harm to the public interest if THJ were enjoined,
6    denying consumers the community that has formed around it. Since the launch of this
7    lawsuit, Defendants have received "numerous statements of support from community
8    members, including parents, volunteers, and retired service members, who have all
9    expressed their own stories on the profound impact that THJ has had on their respective
10   lives." Takahashi Decl. ¶ 46, Ex. 14. By way of limited example, one THJ player is a
11   retired marine who reflected that THJ "has brought back a place and time of tranquility,"
12   and that "if THJ goes down, I am certain that I will not be the only person that would
13   have a negative repercussion from the situation." *Id.* Just as Kris Takahashi started THJ
14   because his commitments as a father, husband, professional, and volunteer caused him
15   to drift away from EQ, many players expressed this same sentiment. Taking that away
16   certainly doesn't benefit members of the public who have found a community on THJ.

## V.    CONCLUSION

18   For the foregoing reasons, Defendants respectfully request that the Court deny
19   Plaintiff's Supplemental Motion for Preliminary Injunction based on equitable estoppel
20   and laches as well as Daybreak's failure to meet any prong of the preliminary injunction
21   standard. [8]

---

[8] Daybreak asks the Court to set a bond of $5,000, claiming THJ will not suffer any
serious harm as a result of an injunction. Given the harm to THJ identified above, the
harm to the public interest, and the speculative nature of Plaintiff's claims—as well as
Plaintiff's financial ability to provide a sufficient bond— a much higher bond would
be "proper" under the circumstances. *See* Fed. R. Civ. P. 65(c); *A & M Records, Inc. v.
Napster, Inc.*, 239 F.3d 1004, 1011, 1028 (9th Cir. 2001) (affirming $5 million bond in
copyright case where preliminary injunction issued); 13-65 Moore's Federal Practice -
Civil § 65.50 ("the trial court should err on the high side [in setting the amount]…an
error on the low side may produce irreparable injury, because damages for an
erroneous preliminary injunction may not exceed the amount of the bond.").

Dated: July 30, 2025                    Respectfully submitted,

                                        By: */s/ Joshua M. Dalton*
                                            Benjamin B. Anger, SBN 269145
                                            **MORGAN, LEWIS & BOCKIUS LLP**
                                            600 Anton Boulevard
                                            Costa Mesa, CA  92626
                                            Telephone: (714) 830-0441
                                            ben.anger@morganlewis.com

                                            Joshua M. Dalton (*pro hac vice*)
                                            **MORGAN, LEWIS & BOCKIUS LLP**
                                            One Federal Street
                                            Boston, MA 02110-1726
                                            Telephone: (617) 341-7700
                                            josh.dalton@morganlewis.com

                                        *Attorneys for Defendants Kristopher Takahashi and Alexander Taylor*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### INDEX OF EXHIBITS IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S SUPPLEMENTAL REQUEST FOR PRELIMINARY INJUNCTION

| Exhibit | Pages |
|---|---|
| Exhibit 1 | 1-2 |
| Exhibit 2 | 3-4 |
| Exhibit 3 | 5-6 |
| Exhibit 4 | 7-12 |
| Exhibit 5 | 13-14 |
| Exhibit 6 | 15-21 |
| Exhibit 7 | 22-28 |
| Exhibit 8 | 29-33 |
| Exhibit 9 | 34-36 |
| Exhibit 10 | 37-38 |
| Exhibit 11 | 39-40 |
| Exhibit 12 | 41-42 |
| Exhibit 13 | 43-44 |
| Exhibit 14 | 45-46 |
| Exhibit 15 | 47-62 |
| Exhibit 16 | 63-64 |
| Exhibit 17 | 65-66 |
| Exhibit 18 | 67-68 |
| Exhibit 19 | 69-70 |
| Exhibit 20 | 71-72 |
| Exhibit 21 | 73-78 |
| Exhibit 22 | 79-109 |
| Exhibit 23 | 110-141 |
| Exhibit 24 | 142-143 |
| Exhibit 25 | 144-149 |
| Exhibit 26 | 150-153 |
| Exhibit 27 | 154-157 |
| Exhibit 28 | 158-161 |
| Exhibit 29 | 162-165 |
| Exhibit 30 | 166-170 |
| Exhibit 31 | 171-175 |
| Exhibit 32 | 176-181 |
| Exhibit 33 | 182-186 |
| Exhibit 34 | 187-191 |
| Exhibit 35 | 192-199 |
| Exhibit 36 | 200-209 |
| Exhibit 37 | 210-218 |
| Exhibit 38 | 219-220 |
| Exhibit 39 | 221-222 |
| Exhibit 40 | 223-224 |
| Exhibit 41 | 225-234 |
| Exhibit 42 | 235-247 |
| Exhibit 43 | 248-273 |