**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

DAYBREAK GAME COMPANY LLC,

                      Plaintiff,

    v.

KRISTOPHER TAKAHASHI and
ALEXANDER TAYLOR,

                    Defendants.

Case No. 25-cv-01489-BAS-BLM

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

**(ECF No. 38)**

This action concerns a dispute between a video game developer and two individuals who have created—and profited—from an unauthorized version of the developer's game. Plaintiff Daybreak Game Company LLC ("Daybreak") moves for a preliminary injunction to stop the operation and promotion of Defendants Kristopher Takahashi and Alexander Taylor's ("Defendants") video game emulator, *The Heroes' Journey* ("THJ"), arguing it unlawfully replicates Daybreak's copyrighted game, *EverQues*t. (*See generally* Supplemental Motion for Preliminary Injunction ("Supplemental Motion" or "Supp. Mot."), ECF No. 38.) On August 12, 2025, the Court held a hearing to consider the parties' arguments. (ECF No. 58.) For the reasons set forth below, the Court **GRANTS** Plaintiff's Supplemental Motion (ECF No. 38).

# I.    BACKGROUND

*EverQuest* is a "massively multiplayer online role-playing game[]" that has been commercially successful.  (Complaint ("Compl.") ¶ 11, ECF No. 1.)  Daybreak owns the intellectual property rights in *EverQuest*, including trademarks and copyrights associated with the *EverQuest* franchise.  (*Id.* ¶¶ 3, 19–20, Exs. B, C.)  Daybreak alleges that Defendants Kristopher Takahashi and Alexander Taylor, as well as yet to be identified Does 1–20, collaborate to "create, develop, distribute, and promote an unauthorized and illegal *EverQuest* emulator called 'The Heroes' Journey,'" which "brazenly copies Daybreak's copyrighted game content."  (*Id.* ¶¶ 1, 4.)  Takahashi and Taylor are the lead producer and developer of THJ, respectively, and play primary roles in promoting it through interviews and communications in online forums.  (*Id.* ¶ 4.)  Daybreak contends that Defendants engage in "systematic and deliberate copyright and trademark infringement" by operating THJ, and they "generate[] revenue through a . . . 'donation' system."  (*Id.* ¶¶ 1, 30.)

Daybreak initiated this action on June 14, 2025, by filing under seal, *inter alia*, the Complaint and an *Ex Parte* Application for a Temporary Restraining Order ("*Ex Parte* Application").  (ECF No. 1.)  Daybreak asserts multiple federal and state claims against Defendants, including: direct copyright infringement under the Copyright Act, 17 U.S.C. § 101; violations of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201; false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a); violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200–17210, predicated on the alleged Lanham Act and DMCA violations; and breach of contract under California common law.  (Compl. ¶¶ 70–135.)

The Court denied Plaintiff's *Ex Parte* Application for failing to make the requisite showing under Federal Rule of Civil Procedure ("Rule") 65(b)(1) and Civil Local Rule 83.3(g)(2) to justify proceeding without notice to Defendants.  (ECF No. 14.)  Daybreak filed an Amended Motion for a Temporary Restraining Order (ECF No. 10), but the motion was rendered moot by the parties' joint stipulation (*see* ECF Nos. 26, 28), which the Court

25cv1489

approved (ECF No. 29).  The stipulation imposed agreed-upon restrictions and obligations, including, *inter alia*, suspension of THJ's updates, preservation and escrow of revenue, issuance of an agreed upon public statement, and evidence preservation, pending briefing on Daybreak's Supplemental Motion for Preliminary Injunction.  (ECF No. 29.)

Daybreak filed the Supplemental Motion presently before the Court (ECF No. 38), which has been fully briefed (ECF Nos. 50, 53).  In the interim, the parties filed three motions to seal, and Defendants filed an *ex parte* motion for leave to submit a supplemental declaration (ECF No. 56), which the Court denied at the hearing (ECF No. 58).[1]

## II.    LEGAL STANDARD

A court may issue preliminary injunctive relief "to preserve the status quo between the parties pending a resolution of a case on the merits." *McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012) (citing *U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010)).  "The Supreme Court has emphasized that preliminary injunctions are an 'extraordinary remedy never awarded as of right.'" *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc) (quoting *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).

A movant seeking a preliminary injunction "must satisfy *Winter's* four-factor test." *Garcia*, 786 F.3d at 740 (citing *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012)); *accord Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 725 F.3d 940, 944 (9th Cir. 2013).  Under this test, a movant must establish: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) a preliminary injunction is in the public interest.  *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009) (citing *Winter*, 555 U.S. at 20).

---

[1] *See* Transcript of Oral Argument Hearing ("Transcript" or "Tr.") 2:23–3:5.  (ECF No. 65.)

## III.    DISCUSSION

Daybreak asks the Court to issue a preliminary injunction enjoining Defendants, and all persons in active concert or participation with them, from: (1) developing, distributing, licensing, promoting, or otherwise making available THJ or any similar software that infringes Daybreak's copyrights; (2) operating the THJ website and any other websites used to promote or distribute THJ; (3) maintaining any public or private repositories, including those hosted on GitHub or other online platforms, containing code for THJ; (4) operating any server emulation software that enables unauthorized access to *EverQuest*; and (5) using Daybreak's trademark or any confusingly similar variation thereof.  (Supp. Mot. 31:4–14.)   Additionally, Daybreak asks the Court to set a bond in the amount of $5,000 pursuant to Rule 65(c).  (*Id.* at 31:15.)

The Court finds that Daybreak has satisfied the requirements for issuance of a preliminary injunction, and therefore grants the preliminary injunction, as discussed below.

### A.    Personal Liability of Defendants

Defendants claim that the correct party to name is Another Quest LLC.  (Opposition ("Opp'n") 18:1–20, ECF No. 50.)  They contend that they cannot be held liable for the "debts, obligations, or other liabilities" of Another Quest LLC solely by reason of their status as members or managers.  (*Id.* at 18:5–6 (citing Cal. Corp. Code § 17703.04(a)).)  Defendants also argue that Daybreak has not properly asserted the alter ego doctrine and thus has not satisfied the requisite showing to pierce the corporate veil.  (*Id.* at 18:10–20.)

The Court disagrees.  The law is clear that "officers and directors are personally liable if they are the 'guiding spirit' behind the infringement."  *DISH Network L.L.C. v. Jadoo TV, Inc.*, No. 20-CV-01891-CRB, 2020 WL 5816579, at *4 (N.D. Cal. Sept. 30, 2020) (quoting *Davis v. Metro Prods., Inc.*, 885 F.2d 515, 524 n.10 (9th Cir. 1989)).  Put differently, district courts within the Ninth Circuit consistently hold that corporate officers, shareholders, and employees are personally liable for a corporation's copyright or trademark infringements when they are a "moving, active[,] conscious force behind the corporation's infringement."  *Novell, Inc. v. Unicom Sales, Inc.*, No. 03-2785-MMC, 2004

WL 1839117, at *17 n.81 (N.D. Cal. Aug. 17, 2004) (citation modified); *see also Santander Consumer USA Inc. v. Drive.Car LLC*, No. 3:23-CV-00288-SLG, 2024 WL 4880668, at *7 (D. Alaska Nov. 25, 2024) (collecting cases).

Although "[f]ederal and state courts have consistently applied the law of corporations to LLCs, including for the purposes of piercing the corporate veil [and] the 'alter ego' doctrine," *see Montgomery v. eTreppid Techs., LLC*, 548 F. Supp. 2d 1175, 1183 (D. Nev. 2008), piercing the corporate veil through alter ego liability is unnecessary when personal liability is premised on the foregoing theory. *See Santander Consumer USA*, 2024 WL 4880668, at *7; *see also Mophie, Inc. v. Shah*, No. SA CV 13-01321 DMG (JEMx), 2014 WL 10988339, at *2 (C.D. Cal. July 24, 2014) ("A corporate officer who is the moving, active, conscious force behind a corporation's infringing activity is subject to personal liability—without regard to alter ego liability.").

Here, the record reflects Defendants' involvement in creating and operating THJ, and Defendants themselves admit they partnered and founded Another Quest LLC to develop and launch it. (Declaration of Kristopher Takahashi ("Takahashi Decl.") ¶¶ 38–39, ECF No. 50-1; Declaration of Alexander Taylor ("Taylor Decl.") ¶ 4, ECF No. 50-3.) Given this level of participation, the Court is persuaded that Defendants were the "moving, active[,] conscious force behind the corporation's infringement," and thus cannot evade liability by simply invoking the entity's existence. *See Adobe Sys. Inc. v. Childers*, No. 5:10-CV-03571 JF/HRL, 2011 WL 566812, at *7 (N.D. Cal. Feb. 14, 2011).

## B.    Type of Injunction

Defendants argue in their response to Plaintiff's Supplemental Motion that Plaintiff is seeking a mandatory injunction, instead of a prohibitory injunction. (Opp'n 2:8–10.)

"A prohibitory injunction prohibits a party from taking action and 'preserve[s] the status quo pending a determination of the action on the merits.'" *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878 (9th Cir. 2009) (quoting *Chalk v. U.S. Dist. Court Cen. Dist. of Cal.*, 840 F.2d 701, 704 (9th Cir. 1988)). By comparison, a mandatory injunction "orders a responsible party to 'take action.'" *Garcia*, 786 F.3d at

25cv1489

740 (quoting *Marlyn*, 571 F.3d at 879). This second type of injunction "goes well beyond simply maintaining the status quo *pendente lite* [and] is particularly disfavored." *Id.* (alteration in original) (quoting *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994)). Hence, the standard for a mandatory injunction is "doubly demanding" and requires showing the law and facts clearly favor the movant's position. *Id.*

The relief Daybreak seeks is directed at halting Defendants' alleged infringement by requiring them to cease "developing, distributing, licensing, promoting, or otherwise making available" THJ. (Supp. Mot. 31:6–7.) Although the Court initially characterized the requested preliminary injunction as mandatory during the hearing, upon further deliberation, the Court finds that such relief is properly understood as prohibitory.[2] While the injunction would require Defendants to "take action," Ninth Circuit precedent makes clear that an injunction which restores the parties to the last uncontested status quo before the controversy arose—e.g., where only the copyright owner exercised rights in its works— remains prohibitory in nature. *See GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) ("The status quo ante litem refers not simply to any situation before the filing of a lawsuit, but instead to 'the last uncontested status which preceded the pending controversy,' . . . . In this case, the status quo ante litem existed before Disney began using its allegedly infringing logo.'" (citing *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th Cir. 1963))). Stated another way, the status quo is the "legally relevant relationship between the parties before the controversy arose." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1061 (9th Cir. 2014) (emphasis omitted).

Here, the last uncontested status existed before Defendants began developing and distributing THJ, i.e., the conduct that gave rise to the present controversy and that Daybreak alleges infringes its copyrights and trademarks. Therefore, the requested injunction would not alter the "legally relevant relationship between the parties," *see Brewer*, 757 F.3d at 1060, since prior to the present controversy, Daybreak alone had the

---

[2] *See* Tr. 3:9–13. (ECF No. 65.)

right to exploit and license *EverQuest* and Defendants had no lawful right to do so.  In fact, as the record reflects, Daybreak routinely "sent cease and desist letters to unauthorized emulator operators when resources and circumstances warranted."  (Reply Declaration of Jennifer Chan ("Reply Chan Decl.") ¶ 18, ECF No. 53-1, Ex. B; ECF No. 53-3.) Accordingly, the relief Daybreak seeks maintains the status quo and is therefore prohibitory in nature.

Nevertheless, even if the Court were to construe the requested relief as a mandatory injunction, the Court is persuaded that Daybreak has satisfied the heightened standard by establishing "that the law and facts clearly favor [its] position, not simply that [it is] likely to succeed." *See Garcia*, 786 F.3d at 740.

### C.    Likelihood of Success on the Merits

#### 1.    Direct Copyright Infringement

Daybreak's primary claim against Defendants is for direct copyright infringement of its *EverQuest* software.  Software "contains three distinct layers of content: literal elements, individual non-literal elements, and dynamic non-literal elements . . . . All three are works of authorship that can merit copyright protection."  *Ticketmaster L.L.C. v. Prestige Ent. W., Inc.*, 315 F. Supp. 3d 1147, 1160 (C.D. Cal. 2018).  Copyright owners possess, among other rights, the exclusive authority "to reproduce the copyrighted work in copies" and "to prepare derivative works based upon the copyrighted work," as well as to authorize others to do the same.  17 U.S.C. § 106(1), (2).

To establish a prima facie case of direct infringement, a plaintiff "must show ownership of the allegedly infringed material" and "demonstrate that the alleged infringers violate[d] at least one exclusive right granted to copyright holders under 17 U.S.C. § 106." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001).  In addition, direct infringement requires the plaintiff to show causation by the defendant, which is also referred to as "volitional conduct." *See Fox Broad. Co., Inc. v. Dish Network L.L.C.*, 747 F.3d 1060, 1067 (9th Cir. 2013).

### i. Ownership

Daybreak asserts "valid and subsisting copyrights in *EverQuest*, . . . which protect the original expression in *EverQuest* software code, visual elements, characters, environments, storylines, and other creative content." (Compl. ¶ 71.) It has submitted copyright registrations (*see id.* Ex. B, ECF No. 1-3 at 1–64), which constitute prima facie evidence of the validity of the copyrights and the facts stated therein. 17 U.S.C. § 410(c). The registrations cover the three distinct layers of *EverQuest* software: "literal elements, individual non-literal elements, and dynamic non-literal elements." *Ticketmaster*, 315 F. Supp. at 1160. Defendants do not dispute Daybreak's ownership or the validity of its copyright registrations. Accordingly, the Court is satisfied Daybreak has shown ownership of the allegedly infringed material.

### ii. Copying

Copying may be demonstrated either through direct evidence or by showing that the defendant had access to the plaintiff's work and that the two works share similarities probative of copying. *Corbello v. Valli*, 974 F.3d 965, 974 (9th Cir. 2020). Direct evidence of copying can also include party admissions. *See Tolkien Tr. v. Polychron*, No. 2:23-cv-4300-SVW-E, 2023 WL 9471264, at *6 (C.D. Cal. Dec. 14, 2023). Daybreak asserts that Defendants copied or infringed all three layers of *EverQuest*: (i) literal elements or source code; (ii) individual non-literal elements, including audiovisual components such as *EverQuest* characters; and (iii) dynamic non-literal elements, including the "real-time experience of traveling through different worlds, hearing their sounds, viewing their structures, encountering their inhabitants and monsters, and encountering other players." (ECF No. 53 at 8:22–9:2.)

Daybreak submits evidence that Defendants' operation infringes both the literal and non-literal elements of its copyrighted software. As Daybreak's expert Garry Kitchen explains, Defendants' operation of THJ involves: (1) systematically altering 234 of Daybreak's copyrighted files, (2) inserting 4,215 files, (3) deleting 66 files, (4) introducing new gameplay systems that alter *EverQuest's* fundamental gameplay, and (5) using

Daybreak's audiovisual asset library, including character models, environmental textures, spell effects, and user interface elements.  (Expert Report of Garry Kitchen ("Kitchen Report") ¶ 149, ECF No. 38-7.)  Defendants, however, contend Daybreak cannot meet its burden because:

> Defendants did not copy, modify, or otherwise use any of [*EverQuests's*] source code or protected expressions. THJ was built using . . . fan-written, clean-room, reverse engineered, open-source code, not Daybreak's server code . . . [and] [r]everse engineering is a widely accepted, lawful method of software development that courts have recognized as a valid defense to infringement.

(Opp'n 13:3–9.)  Defendants also argue that even if copyright infringement applied, their "alteration of a handful of rudimentary files in creating [their] own original content is protected by the fair-use doctrine."  (*Id.* at 14:24–25.)

Defendants are correct to invoke as support *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992), which is the seminal case on "intermediate copying" in the Ninth Circuit.  In *Sega*, the plaintiff manufactured video game consoles and cartridges, and the defendant manufactured video game cartridges.  977 F.2d at 1514.  "As part of the reverse engineering process, Accolade transformed the machine-readable object code contained in commercially available copies of Sega's game cartridges into human-readable source code" and then "generated printouts of the resulting source code" for its engineers to refer to in developing Accolade's own Sega-compatible games.  *Id.*  The Ninth Circuit held that the reverse engineering process constituted "intermediate copying,"  which may infringe the exclusive rights granted to the copyright owner, regardless of whether the final product of the copying also infringes those rights.  *Id.* at 1519.

The Ninth Circuit nevertheless concluded that Accolade had a "fair use" defense.  *Id.* at 1520–28.  "*Sega* held that intermediate copying of computer code to prepare derivative works based on copyrighted work is fair use where such disassembly and copying is the only way to gain access to the functional elements embodied in a copyrighted work, and where there is a legitimate reason for seeking such access."  *Fox Broad. Co. v.*

*Dish Network LLC*, 160 F. Supp. 3d 1139, 1175 (C.D. Cal. 2015) (citing *Sega*, 977 F.2d at 1527). However, the facts in this case differ materially from *Sega*, and thus it is not controlling.

Unlike in *Sega*, where Accolade engaged in reverse engineering solely to access functional elements embodied in the code of Sega's software in order to create its own creative work, Defendants here copy and exploit Daybreak's expressive audiovisual assets. *See Sega*, 977 F.2d at 1522 ("With respect to the video game programs contained in Accolade's game cartridges, there is no evidence in the record that Accolade sought to avoid performing its own creative work."). Here, the record shows that THJ uses Daybreak's character models, environmental textures, spell effects, and user interface elements nearly wholesale. (*See, e.g.*, Declaration of Walter Tuanqui ("Tuanqui Decl.") Exs. A–D, ECF No. 1-13–1-16; Tuanqui Decl. ¶¶ 9–27, ECF No. 1-10; Kitchen Report ¶ 149.) These are not merely functional elements but instead constitute expressive works protected under U.S. copyright law. *See, e.g.*, *Davis v. Elec. Arts Inc.*, No. 10-03328 RS, 2012 WL 3860819, at *1 (N.D. Cal. Mar. 29, 2012), *aff'd,* 775 F.3d 1172 (9th Cir. 2015) ("*Madden NFL* permits users to simulate an NFL football game. The game is elaborate and entails many creative and expressive features, including extensive audiovisual effects."); *see also Novalogic, Inc. v. Activision Blizzard*, 41 F. Supp. 3d 885, 898 (C.D. Cal. 2013) (holding that the video game *Call of Duty* is an expressive work because the game features "distinctive characters," requires that the players "interact with the virtual environment as they complete a series of combat missions," and allows players to "control the fate of characters and the world they inhabit").

The following side-by-side comparisons illustrate some of the expressive parallels between *EverQuest* and THJ:

//

//

//

//



*Screenshots Comparing Character Design: EverQuest's Lady Vox and THJ*

(Tuanqui Decl. 9, EX. A; ECF No. 1-13 at 1)

25cv1489



*Screenshots Comparing Environmental Assets: EverQuest Zone Architecture and THJ*

*(Tuanqui Decl. 13, EX. B; ECF No. 1-14 at 1)*

25cv1489



*Screenshots Comparing User Interface Elements: EverQuest Iconography and THJ*

*(Tuanqui Decl. 24, EX. C; ECF No. 1-15 at 6)*

25cv1489

Furthermore, the Court is unpersuaded that Defendants' operation of THJ is protected by the fair use doctrine, given, *inter alia*, the commercial nature of THJ and the evident adverse effect on the market for *EverQuest*.  *See infra* Section III.B.3.iii (discussing fair use) and Section III.D (discussing irreparable harm).   Nor does Defendants' characterization of their copying as an "alteration of a handful of rudimentary files" carry weight, as "quantitatively insignificant infringement may be substantial if the material is qualitatively important to plaintiff's work."  *Apple Comput., Inc. v. Microsoft Corp.*, 821 F. Supp. 616, 624 (N.D. Cal. 1993), *aff'd*, 35 F.3d 1435 (9th Cir. 1994) (citing *Narell v. Freeman*, 872 F.2d 907, 913 (9th Cir. 1989)).   Thus, Defendants may not escape liability merely by characterizing their copying as quantitatively trivial when it appropriates qualitatively significant creative expression in *EverQuest*.

Accordingly, the Court finds that Daybreak has established Defendants' violation of its exclusive copyright to reproduce and create derivative works by copying both the literal and non-literal elements of *EverQuest* software.  *See* 17 U.S.C. § 106(1), (2).

### iii.    Volitional Conduct

To succeed on a claim for direct copyright infringement, Daybreak "must also establish causation, which is commonly referred to as the 'volitional-conduct requirement.'"  *See VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 731–32 (9th Cir. 2019); *see also Fox Broad. Co.*, 747 F.3d at 1067 ("Infringement . . . require[s] that the defendant cause the copying."); *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 666 (9th Cir. 2017). The Ninth Circuit has explained that volitional conduct is present where the defendant "exercised control (other than by general operation of a [website]); selected any material for upload, download, transmission, or storage; or instigated any copying, storage, or distribution" of copyrighted materials.  *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 670 (9th Cir. 2017).  Automatic copying, storing, or transmission of copyrighted materials is insufficient to allege volitional conduct.  *Id.* at 669–70.  Volitional conduct does not require willfulness or active decision-making; rather, it "simply stands for the unremarkable proposition that proximate causation historically underlies copyright

infringement liability no less than other torts." *Id.* at 666 (internal quotation marks omitted).  Expressed differently, "*direct* liability must be premised on conduct that can reasonably be described as the *direct cause* of the infringement." *VHT, Inc.*, 918 F.3d at 731 (citation modified) (emphasis in original).

Here, the Court finds the record demonstrates the necessary causal nexus between Defendants' conduct and the infringement of Daybreak's copyrighted works.  Specifically, Defendants' operation of THJ results in systematic modifications to EverQuest software (Kitchen Report ¶ 149), through which Defendants "exercised control other than by general operation of a website" of copyrighted materials.  *See Giganews*, 847 F.3d at 670 (citation modified).  Defendants not only modify Daybreak's files by operating THJ, thereby exercising control and directly causing infringement, but also instruct others to do so. (Kitchen Report ¶¶ 55–87.)  For instance, in discussing the THJ installation process, Kitchen explains:

> [T]he user [is] asked to copy the physical intellectual property assets which make up the copyrighted EverQuest Rain of Fear game release as they reside in their Steam content folder (identified by the GAME_APP_ID 205710), and paste a copy of the entirety of the games' client-side [intellectual property] into the newly-created folder THJ, where they will used as game assets for *The Heroes' Journey* game.

(*Id.* ¶ 85.)  By requiring this step, Defendants infringe on Daybreak's copyrighted work, instigating third-party infringement by THJ users who "copy[], stor[e], or distribut[e]," *inter alia*, *EverQuest's* expressive works, including, "character models, environmental textures, user interface graphics, spell effects, animations, and other visual assets representing significant artistic and technical investment." (*Id.* ¶¶ 55–59.)  Accordingly, Defendants' conduct goes beyond the general operation of a website, and the Court finds that the volitional conduct requirement for direct infringement is likely satisfied.

In sum, the Court is persuaded that Daybreak has demonstrated a likelihood of success on the merits of its direct copyright infringement claim.

25cv1489

## 2.    DMCA

Congress enacted the DMCA, 17 U.S.C. § 1201, to "mitigate the problems presented by copyright enforcement in the digital age." *MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928, 942 (9th Cir. 2010). The Ninth Circuit has explained that § 1201 of the DMCA sets forth "two distinct types of claims." *Id.* at 944. "First, § 1201(a) prohibits the circumvention of any technological measure that effectively controls access to a protected work and grants copyright owners the right to enforce that prohibition." *Id.* More specifically, § 1201(a)(1)(A) contains a general prohibition against "circumvent[ing] a technological measure that effectively controls access to a work protected under [the Copyright Act]," while § 1201(a)(2) prohibits trafficking in technology that circumvents a technological measure that "effectively controls access" to a copyrighted work. "Second, and in contrast to § 1201(a), § 1201(b)(1) prohibits trafficking in technologies that circumvent technological measures that effectively protect 'a right of a copyright owner.'" *MDY Indus.*, 629 F.3d at 944 (quoting 17 U.S.C. § 1201(b)(1)).

Daybreak alleges violations of § 1201(a)(1) and (a)(2). Under § 1201(a), "to 'circumvent a technological measure' means to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner." 17 U.S.C. § 1201(a)(3)(A). Moreover, "a technological measure 'effectively controls access to a work' if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work." *Id.* § 1201(a)(3)(B).

Here, the record supports that *EverQuest* is protected by "a technological measure that effectively controls access to a work" under § 1201(a)(1) and (a)(2). Specifically, Daybreak employs two primary technological protection measures ("TPMs"): First, Daybreak controls access to its servers and intellectual property by requiring "account verification, subscription validation, and access authorization . . . on Daybreak's servers." (Supp. Mot. 18:3–4.) Unless the users receive authentication from Daybreak's servers,

"they cannot reach any game servers containing copyrighted content." (*Id.* at 18:5–6.) Second, "[d]uring gameplay, Daybreak's servers maintain . . . protocols that continuously verify user authorization, . . . [and] [u]sers whose accounts become invalid or subscriptions expire are disconnected from the service." (*Id.* at 18:7–10.) Both of these technological measures "require[] the application of information, or a process or a treatment . . . to gain access to the work" or to continue accessing the work. *See MDY Indus.*, 629 F.3d at 954–55 (recognizing processes that were required both to initiate and to maintain access to a video game's dynamic non-literal elements constitute effective access controls under § 1201(a)(3)(B)).

Moreover, the record supports Daybreak's position that Defendants circumvent its TPMs. According to Daybreak's expert, Garry Kitchen, THJ requires users to install Daybreak's proprietary software and then systematically modifies files. (Kitchen Decl. ¶¶ 10, 24; Expert Report ¶¶ 90–93.) Most notably, THJ circumvents *EverQuest's* TPMs by changing the URL of *EverQuest*, held in the *eqhost.txt* file, to redirect server calls from the authorized "everquest.com" server to THJ's unauthorized server, "projecteq.net." (Kitchen Decl. ¶¶ 24–26; Expert Report ¶¶ 126–28, 132.) Moreover, THJ circumvents the password and login authentication process to access gameplay, held in the *eqlsClient.ini* file. (Expert Report ¶¶ 129–32.)

Ultimately, the DMCA defines "circumvent" as "to avoid, bypass, remove, deactivate, or impair a technological measure." 17 U.S.C. § 1201(a)(3)(A). Under this definition, Defendants likely engaged in circumvention by altering files to redirect users to THJ's servers and bypass Daybreak's official servers that implement TPMs, thereby providing access to *EverQuest*'s copyrighted works, and by evading Daybreak's login verification URLs, likewise obtaining unauthorized access to those works. *See, e.g.*, *Bungie, Inc. v. AimJunkies.com*, No. C21-0811 TSZ, 2023 WL 6806996, at *4 (W.D. Wash. Oct. 16, 2023) (citing *MDY Indus.*, 629 F.3d at 947) ("Bypassing a password to access a file is the type of circumvention the DMCA was intended to prevent.").

25cv1489

Moreover, the record supports the finding that Daybreak is likely to succeed on the merits with respect to violation of § 1201(a)(2) as well. That is, Defendants (1) traffic in (2) a technology or part thereof (3) that is primarily designed, produced, or marketed for, or has limited commercially significant use other than (4) circumventing a technological measure (5) that effectively controls access (6) to a copyrighted work. *See* 17 U.S.C. § 1201(a)(2).

As discussed, the Court is persuaded that the fourth and fifth elements are met from its analysis of § 1201(a)(1). And Defendants do not dispute Daybreak owns valid and subsisting copyrights in *EverQuest*; so therefore, the sixth element is also satisfied. Furthermore, the first two elements are met because THJ "traffics in a technology or part thereof"—that is, Defendants provide and distribute THJ to the public. The Court is also persuaded that the third element is met because, as previously discussed, Daybreak provides evidence of THJ's step-by-step installation process, which instructs users on how to obtain and modify a specific version of *EverQuest*, *Rain of Fear*, as a prerequisite to playing THJ. (Compl. ¶ 52; Expert Report ¶¶ 66–87.) This demonstrates that the product is designed and marketed to circumvent Daybreak's technological measures that control access to its copyrighted works.

Defendants primarily contend that no circumvention occurs because, in their view, "Daybreak's measures protect the *Daybreak* servers . . . THJ and other emulators *never even attempt to connect to Daybreak's servers*." (Opp'n 15:10–12.) However, Defendants cite no authority to support this interpretation of § 1201(a), and the Court is skeptical of a reading of the statute that would impose a requirement of attempted or direct interaction with the copyright holder's servers. Even though Defendants do not directly access Daybreak's servers, their operation of THJ effectively circumvents *EverQuest's* TPMs, enabling them and third parties to access *EverQuest's* copyrighted works.

- 18 -

In sum, the Court is persuaded that Daybreak has demonstrated a likelihood of success on the merits of its claims that Defendants violated 17 U.S.C. § 1201(a)(1) and (a)(2).[3]

### 3. Affirmative Defenses

#### i. Estoppel

"Estoppel is an equitable doctrine invoked to avoid injustice in particular cases." *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 59 (1984). In a copyright infringement action, estoppel is a defense that the court, not the jury, must decide. *Granite State Ins. Co. v. Smart Modular Techs., Inc.*, 76 F.3d 1023, 1027 (9th Cir. 1996). A plaintiff "is estopped from asserting a copyright claim if he has aided the defendant in infringing or otherwise induced the defendant to infringe or has committed covert acts such as holding out by silence or inaction." *Bangkok Broad. & T.V. Co. v. IPTV Corp.*, 742 F. Supp. 2d 1101, 1115 (C.D. Cal. 2010) (citation modified) (quoting *Field v. Google, Inc.*, 412 F. Supp. 2d 1106, 1116 (D. Nev. 2006)).

To prevail on an estoppel defense, a defendant must establish: "(1) the plaintiff knew of the defendant's allegedly infringing conduct; (2) the plaintiff intended that the defendant rely upon his conduct or act so that the defendant has a right to believe it is so intended; (3) the defendant is ignorant of the true facts; and (4) the defendant detrimentally relied upon the plaintiff's conduct." *Shropshire v. Fred Rappoport Co.*, 294 F. Supp. 2d 1085, 1097 (N.D. Cal. 2003) (quoting *Audit Servs., Inc. v. Rolfson*, 641 F.2d 757, 761 (9th Cir. 1981)). All four elements must be present. *Hadady Corp. v. Dean Witter Reynolds, Inc.*, 739 F. Supp. 1392, 1399 (C.D. Cal. 1990).

Defendants assert the defense of equitable estoppel, contending that it bars Daybreak's claims because "for more than two decades" Daybreak and its predecessors knew of "allegedly infringing conduct." (Opp'n 7:5–7.) Furthermore, Defendants contend

---

[3] Having found a likelihood of success on the merits of the copyright and DMCA claims, the Court need not reach the alternative claims in Daybreak's Supplemental Motion, including unfair competition under the Lanham Act and the UCL, or the separate breach of contract claim.

that Daybreak not only failed to "raise[] any copyright issues []or pursue[] any legal action against any emulator" (*id.* at 7:7–8), but it also gave "both implicit . . . and explicit . . . outright endorsements and encouragement" to emulator projects. (*Id.* at 6:20–22.)  As a result, Defendants contend they reasonably relied on Daybreak's "awareness, acceptance, and encouragement of emulators since its inception" (*id.* at 9:9) and invested "thousands of hours in developing" THJ (*id.* at 9:24–25; Takahashi Decl. ¶¶ 40, 49). Nevertheless, Defendants offer no evidence of any conduct by Daybreak specifically directed at them that could reasonably support a belief that Daybreak intended Defendants to rely on such conduct, or that they had any right to believe such intent existed.

Defendants contend that this case resembles *Field*.  In *Field*, the district court held that an author was estopped from asserting copyright infringement against Google, because Google's caching system included a "'no-archive' meta-tag [that] is a highly publicized and well-known industry standard," and the plaintiff chose not to employ it.  412 F. Supp. 2d at 1116–17.  There, the plaintiff's silence could reasonably be understood as permission for Google to display cached links to the copyrighted works published on his personal website, as he knew that "Google would automatically interpret that silence as permission." *Id.*  By contrast, no analogous "highly publicized and well-known industry standard" exists here that that could support Defendants' asserted reliance.  At most, Defendants identify statements of generalized tolerance for, or positive remarks about, third-party emulators. For example, they rely heavily on statements concerning Project 1999, an emulator with which Daybreak entered into a written agreement recognizing it as a "fan-based, not-for-profit" project.  (Opp'n 8:7.)  Nothing in the record suggests, however, that Daybreak intended or acted in a manner that would allow Defendants to believe that they could profit from Daybreak's copyrighted works without a written agreement or license.

Moreover, the Court is also unaware of any "true facts" of which Defendants were ignorant.  To the contrary, and despite Defendants' assertion that Daybreak did not raise copyright issues or pursue legal action against emulators, the record shows Daybreak regularly sent cease and desist letters to unauthorized emulator operators, as previously

noted. (Reply Chan Decl. ¶ 18, ECF No. 53-1, Ex. B.) Because "there can be no estoppel absent any of the elements," and Defendants have not established the second of third elements, their defense must fail. *Winn v. Campbell*, 184 P.3d 852, 857 (Idaho 2008). Thus, Defendants equitable estoppel defense does not bar Daybreak's claims.

### ii. Laches

"Laches is an equitable time limitation on a party's right to bring suit." *Kling v. Hallmark Cards, Inc.*, 225 F.3d 1030, 1036 (9th Cir. 2000). "To demonstrate laches, a party must establish[:] (1) lack of diligence by the party against whom the defense is asserted[;] and (2) prejudice to the party asserting the defense." *Apache Survival Coalition v. United States*, 21 F.3d 895, 905 (9th Cir. 1994). Specifically, "a defendant must prove both an unreasonable delay by the plaintiff and prejudice to itself." *Kling*, 225 F.3d at 1032. "[T]he period of delay for laches for a copyright infringement claim runs only from the time that the plaintiff knew or should have known about an actual or impending infringement, not an adverse claim of ownership." *Id.* at 1036; *see also Entous v. Viacom Int'l, Inc.*, 151 F. Supp. 2d 1150, 1155 (C.D. Cal. 2001) (*citing Roley v. New World Pictures, Ltd.*, 19 F.3d 479, 481 (9th Cir. 1994)) ("Under federal copyright law, '[a] cause of action for copyright infringement accrues when one has knowledge of a violation or is chargeable with such knowledge.'"). Nonetheless, "courts are loath to withhold relief solely" because of delay, which "is not particularly probative in the context of ongoing, worsening injuries." *Arc of Cal. v. Douglas*, 757 F.3d 975, 990 (9th Cir. 2014).

Defendants assert the defense of laches, arguing that Daybreak's claims are barred because it "waited so long, and been so lax [that] it has lost its right to sue emulators such as THJ—and at a minimum has waived its right to seek injunctive relief." (Opp'n 10:12–13.) They contend that because Daybreak "has known for the past decade—that emulator servers, like THJ, . . . continue to be built using open source . . . code," yet failed to act, its copyright claim for injunctive relief is barred. (*Id.* at 10:25–27.) Consequently, they argue that Daybreak "slept through emulators' alleged copyright violations for at least ten years

and is now attempting to seek injunctive relief without even attempting to make an excuse for its delay." (*Id.* at 10:28–11:2.)

The Court is not persuaded.  The record does not show that Daybreak "passively slept on [its] rights, *see Eat Right Foods Ltd. v. Whole Foods Market, Inc.*, 880 F.3d 1109, 1121 (9th Cir. 2018), nor does it show that it unreasonably delayed seeking injunctive relief for its copyright claims.  As previously discussed, the record reflects that Daybreak issued cease and desist letters to unauthorized emulator operators on multiple occasions.  (Reply Chan Decl. ¶ 18, Ex. B.)  In addition, apart from the assertions that Daybreak was generally aware of emulators, the record contains a December 12, 2024 anonymous email to Daybreak's Privacy Officer, which Daybreak asserts was auto-filtered to a junk email folder and not discovered until after litigation was initiated.  (*See* Supplemental Declaration of Nicholas B. Janda ("Supp. Janda Decl.") ¶ 15, ECF No. 38-2; Supp. Janda Decl. Ex. 1, ECF No. 38-3; Reply Chan Decl. ¶ 5; Takahashi Decl. ¶ 45.)  While the parties dispute, based on this communication, the precise date on which Daybreak obtained actual or constructive knowledge of Defendants' infringing conduct and its scope, the Court finds the present record insufficient to establish unreasonable delay by Daybreak in asserting its rights or prejudice to Defendants from any alleged lack of diligence.

Even affording Defendants the benefit of the doubt, courts have found comparable delays of six to eight months, and even longer, to be justified.  Such delays may be found excusable when attributable to the plaintiff's efforts to investigate the matter, pursue settlement negotiations, or otherwise attempt to resolve the dispute short of litigation.  *See Bangkok Broad. & T.V. Co. v. IPTV Corp.*, No. CV 09-03803 SJO (SSx), 2009 WL 10670331, at *3 (C.D. Cal. July 27, 2009) (collecting cases)  Here, Daybreak typically sought to address infringing conduct from emulators through extrajudicial means, such as cease and desist letters, and litigation may have become necessary only after Defendants' infringement expanded to such an extent that the resulting harm became irreparable.  Given the limited evidence presented, the Court is disinclined to withhold equitable relief,

25cv1489

particularly in light of the ongoing and escalating harm that would likely continue absent an injunction.  Accordingly, the Court rejects Defendants' laches defense.

### iii.    Fair Use

Defendants contend that "[e]ven where a defendant has prima facie infringed one of the Section 106 rights by creating a 'substantially similar' copy or derivative work, Section 107 of the [Copyright] Act provides that 'the fair use of a copyrighted work . . . is not an infringement of copyright.'" (Opp'n 14:15–17.)  They argue that copying qualifies as fair use when undertaken as a "preliminary step" in developing a "new, non-infringing product, even if [that] new product competes with the original." (*Id.* at 14:18–20.)  Thus, Defendants assert that their "alteration of a handful of rudimentary files in creating [their] own original content is protected by the fair-use doctrine." (*Id.* at 14:23–25.)

The four factors used to determine whether or not the use of a copyrighted work is fair use include: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 590 (1994).  While all fair use factors should be considered, the Supreme Court has emphasized that the fourth factor is "undoubtedly the single most important element of fair use." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 566 (1985).  Moreover, "[t]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Maya Magazines*, 688 F.3d at 1174 (citing *Campbell*, 510 U.S. at 579).

First, the commercial purpose of THJ weighs against a finding of fair use. "[A]lthough commercial use of the copyrighted material is not dispositive of the fair use inquiry, it can counsel against a finding of fair use, particularly where the work is not transformative." *Fox Broad. Co. Inc. v. Dish Network, L.C.C.*, 905 F. Supp. 2d 1088, 1104 (C.D. Cal. 2012), *aff'd*, 723 F.3d 1067 (9th Cir. 2013).  A work is "transformative" when

it does not "merely supersede the objects of the original creation" but instead "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1164 (9th Cir. 2007) (citing *Campbell*, 510 U.S. at 579). The Court finds this is not the case, particularly in light of Defendants' extensive copying of Daybreak's individual and dynamic non-literal elements, which they used to operate a competing game with minimal "new expression, meaning, or message." *Id.*

Second, the creative nature of Daybreak's copyrighted works entitles them to heightened protection, as "[w]orks that are creative in nature are closer to the core of intended copyright protection than are more fact-based works." *Napster*, 239 F.3d at 1016. Proceeding to the third factor, this factor weighs against fair use if the infringer publishes "the heart" of the copyrighted work without justification. *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1176 (9th Cir. 2012). The Court finds that Defendants' copying of substantial and qualitatively significant portions of Daybreak's expressive work—specifically, the individual and dynamic non-literal elements at the 'heart' of *EverQuest*—weighs against them.

Lastly, the likelihood of an adverse impact on the market for the original work—the most heavily weighted factor—weighs against fair use. The fourth factor "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market' for the original." *Campbell*, 510 U.S. at 578–79 (citing 3 *M. Nimmer & D. Nimmer, Nimmer on Copyright* § 13.05[A][4] (1993)); *see also Maya Magazines*, 688 at 1182 ("[T]o negate fair use one need only show that if the challenged use should become widespread, it would adversely affect the potential market for the copyrighted work."). As discussed in the irreparable harm analysis, *see infra* Section III.D., the Court is persuaded that THJ directly competes with *EverQuest* for users, and the evidence demonstrates not

only likely actual harm to Daybreak's market but also the potential for further loss. Accordingly, all four factors weigh against a finding of fair use.

### D.    Irreparable Harm

Harm is irreparable if "there is no adequate legal remedy, such as an award of damages." *Brewer*, 757 F.3d at 1068. "[E]conomic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award." *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991). The Ninth Circuit has held that it is no longer appropriate to apply a presumption of irreparable harm in trademark and copyright cases, *see Herb Reed Enterprises, LLC v. Florida Entertainment Management, Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013), and that a "plaintiff must demonstrate a likelihood of irreparable harm as a prerequisite for injunctive relief, whether preliminary or permanent," *Flexible Lifeline Systems, Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 994–95 (9th Cir. 2011). *See also Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 981 (9th Cir. 2011). Nevertheless, courts have observed that "[i]n run-of-the-mill copyright litigation, . . . proof of such harm stemming from infringement . . . should not be difficult to establish." *Apple Inc. v. Psystar Corp.*, 673 F. Supp. 2d 943, 948 (N.D. Cal. 2009), *aff'd*, 658 F.3d 1150 (9th Cir. 2011).

In the copyright context, "[p]laintiffs may establish an irreparable harm stemming from the infringement (e.g., loss of market share, reputational harm)," or irreparable harm to "a plaintiff's right to control the use of his/her copyrighted material." *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1217 (C.D. Cal. 2007). Furthermore, "[i]n the DMCA context, irreparable harm may be established by evidence that circumvention is undermining the copyright owner's negotiating position, damaging goodwill with licensees, threatening the copyright owner's business model, risking the copyright owner's market share, causing reputational harm to the copyright owner or its works, and/or enabling third parties to infringe the owner's copyrights." *Synopsys, Inc. v. AzurEngine Techs., Inc.*, 401 F. Supp. 3d 1068, 1074 (S.D. Cal. 2019) (citing *Disney*

*Enterps., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 865 (9th Cir. 2017) (examples 1-3); *Apple Inc.*, 673 F. Supp. 2d at 946 (examples 4-6)).

Here, the record suggests harm to Daybreak's player base that likely undermines its market share, as statistical analysis reveals a "correlation between THJ's growth and the decline in official *EverQuest* server populations." (Supp. Mot. 27:3–4.) For instance, in December 2024, it was initially reported "that THJ already had 2,000 users . . . [t]oday, THJ has more than 30,000 users and . . . online activity demonstrates that THJ is stealing directly from *EverQuest's* users." (*Id.* at 27:20–25.) Daybreak argues this rapid expansion threatens *EverQuest*, as "each departing player makes the remaining experience less attractive," accelerating decline to a point, where below a certain threshold, the game is no longer viable. (Kitchen Decl. ¶¶ 33–34.) On this showing, the erosion of market share that threatens to undermine Daybreak's business model, along with the enabling of ongoing third-party infringement by THJ users, the Court is persuaded that Daybreak is experiencing harms that "cannot be quantified or repaired with monetary damages." *See Warner Bros. Ent. Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003, 1014 (C.D. Cal. 2011).

Defendants' strongest rebuttal argues that Daybreak cannot "show that its claimed injuries were *caused* by Defendants' actions rather than simply happening *contemporaneously* with them." (Opp'n 22:11–12.) Although statistical data showing a decline in *EverQuest's* player base since THJ's launch might, on its own, suggest only correlation rather than causation, Plaintiff supplements this evidence with a declaration from its attorney, Nicholas Janda. (*See generally* ECF No. 38-2.) The declaration highlights comments posted by THJ fans on YouTube videos describing the THJ gaming experience. (*Id.* ¶¶ 2–14.) Among other comments, users have stated: "Hands down the best thing that has ever happened to the game [is THJ]. Never going back to original [*EverQuest*] again"; "The day I started THJ I stopped my [*EverQuest*] subs"; and "I literally have zero urge to play LIVE [*EverQuest*] anymore after playing this lol[.] This could end badly for the server if [THJ] manages to pull even more people from retail." (*Id.* ¶¶ 2–7.) Taken together, the statistical evidence and THJ user statements support a

reasonable inference that THJ competes with *EverQuest*, that players have migrated from *EverQuest* to THJ, and that Defendants' conduct is the proximate cause of the irreparable harm Plaintiff is likely to suffer absent relief.

Moreover, the Court agrees with Daybreak that THJ operates without Daybreak's quality assurance or security controls, which "exposes players to potential security vulnerabilities, gameplay imbalances, and other issues that could reflect poorly on the *EverQuest* brand." (Supp. Mot. 26:12–14.)  For instance, Daybreak contends that Defendants allow users to play an accelerated version of its game that "allows users to burn through content at an unhealthy pace." (ECF No. 53 at 6:1–3.)  Such unauthorized access to *EverQuest* copyrighted works undermines Daybreak's control over its intellectual property, risks reputational damage, and threatens its long-term goodwill in ways that are "not readily . . . remedied with damages." *Disney*, 869 F.3d at 866.

Ultimately, the Court is persuaded that Daybreak has shown that Defendants' conduct is likely to cause irreparable harm. *See Rent-A-Ctr.*, 944 F.2d at 603.  In sum, this factor tilts towards granting injunctive relief.

### E. Balance of Equities

To qualify for injunctive relief, Daybreak must show that the balance of the equities tips in its favor. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009).  In assessing whether Daybreak meets its burden, "the district court has a 'duty . . . to balance the interests of all parties and weigh the damage to each.'" *Id.* (quoting *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980)). Daybreak argues that the equities tip in its favor because the violation of its intellectual property rights threatens the "control over its IP, its reputation, and the franchise's existence." (Supp. Mot. 30:3–4.)  Moreover, it argues that defendants "who knowingly infringe[] another's copyright 'cannot complain of the harm that will befall it when properly forced to desist from its infringing activities.'" (*Id.* at 30:7–10 (quoting *Triad Sys. Corp. v. Se. Exp. Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995)).)  Defendants contend that

Daybreak's delay tips the equities in its favor, and that the injunction would effectively render THJ nonexistent.  (Opp'n 24:11–19.)

Nevertheless, "a defendant who builds a business model based upon a clear violation of the property rights of the plaintiff cannot defeat a preliminary injunction by claiming the business will be harmed if the defendant is forced to respect those property rights."  *eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1069 (N.D. Cal. 2000).  Where, as here, the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense merits little equitable consideration.  *Triad Sys. Corp.*, 64 F.3d at 1338, *superseded on other grounds by statute*, 17 U.S.C. § 117(c).  Accordingly, the balance of the equities tips in Daybreak's favor, satisfying the third requirement for injunctive relief.

## F.    Public Interest

The Court also agrees with Daybreak that an injunction would be in the public interest.  "Courts often find that the public has a strong interest in protecting intellectual property rights."  *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 854 (N.D. Cal. 2019) (citing cases).  Beyond reiterating that Daybreak is unable to meet its burden for a preliminary injunction, Defendants' opposition argues that enjoining THJ would harm the public interest by denying their consumers the community that has formed from it.  (Opp'n 24:21–25:16.)

The Court is not persuaded that harm to the THJ community outweighs the broader public interest served when copyright law protections are enforced.  *See Perfect 10 v. Google, Inc.*, 416 F. Supp. 2d 828, 859 (C.D. Cal. 2006), *overruled on other grounds by Perfect 10 v. Amazon.com, Inc.*, 487 F.3d 701 (9th Cir. 2007) ("[T]he public interest is also served when the rights of copyright holders are protected against acts likely constituting infringement."); *see also Amini Innovation Corp. v. KTY Int'l Mktg.*, 768 F. Supp. 2d 1049, 1057 (C.D. Cal. 2011) (finding injunction served public interest because "[a]llowing such infringement of intellectual property discourages future innovation by failing to provide an adequate forum through which individuals and corporations can protect their own ideas");

*Apple Inc.*, 673 F. Supp. 2d at 950 (finding "injunction preventing Psystar from continuing to commit infringing and illegal, if not criminal, acts under the Copyright Act and DMCA would ensure that the public will continue to benefit from the creative fruits of Apple's labor"). The Court finds this final requirement is met, making an injunction appropriate under the *Winter* test.p

### G.   Bond

Under Rule 65(c), "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." Because "the purpose of . . . a bond is to cover any costs or damages suffered by the [party sought to be enjoined] arising from a wrongful injunction," *see Gorbach v. Reno*, 219 F.3d 1087, 1092 (9th Cir. 2000), "the party affected by the injunction [bears the] obligation of presenting evidence that a bond is needed," *see Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 883 (9th Cir. 2003). *See also Extreme Reach, Inc. v. Spotgenie Partners, LLC*, No. CV 13-07563-DMG (JCGx), 2013 WL 12081182, at *9 (C.D. Cal. Nov. 22, 2013) ("The burden of establishing the amount of bond necessary to secure against the wrongful issuance of an injunction rests with the [non-movant]."). District courts have "wide discretion in setting the amount of a security bond." *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 733 (9th Cir. 1999). In setting bond, however, the court must consider evidence of the "potential financial ramifications of issuing a preliminary injunction." *Id.*

Daybreak originally requested that the Court set a bond of $5,000 in its Supplemental Motion. (Supp. Mot. 31:15.) Defendants argued in their opposition that "a much higher bond would be 'proper' under the circumstances," and supported their argument with *Napster*, which affirmed a $5 million bond in a copyright case where a preliminary injunction was issued. (Opp'n 25 n.8.) At oral argument, the Court inquired as to what would be an appropriate bond amount. (Tr. 10:6–8.) Having considered the parties' arguments, the Court finds that because Defendants' THJ operations generate

25cv1489

approximately $100,000 in monthly revenue (*id.* at 8:25–9:3, 10:17–20), and to protect Defendants from "loss in the event that future proceedings prove that the injunction issued wrongfully," *Edgar v. MITE Corp.*, 457 U.S. 624, 649 (1982)), a substantial bond is necessary to secure against potential damages. Accordingly, pursuant to Rule 65(c), the Court sets the bond in the amount of $1,000,000.

## CONCLUSION AND ORDER

In light of the foregoing, the Court **GRANTS** Daybreak's Supplemental Motion for Preliminary Injunction (ECF No. 38). Accordingly, the Court **ENJOINS** Defendants, along with their officers, directors, agents, employees, and all persons or entities acting in active concert or participation with them, from: developing, distributing, licensing, promoting, or otherwise making available THJ or any similar software that infringes Daybreak's copyrights; operating the website *heroesjourneyemu.com* and any other websites used to promote or distribute THJ; maintaining any public or private repositories containing code for THJ, including at *github.com/The-Heroes-Journey-EQEMU* or any other online repository; operating any server emulation software that enables unauthorized access to Daybreak's *EverQuest* copyrighted works; and using the EVERQUEST mark or any confusingly similar variations thereof.

Within seven (7) days of the issuance of this Order, Daybreak shall post a bond in the amount of $1,000,000.00 and file with the Court proof of issuance of such bond. The injunction described above shall be effective immediately upon the posting of this bond. This Order will supersede the Court's previous Order terminating Daybreak's Amended Motion for Temporary Restraining Order and granting the parties' Joint Motion to Enter a Stipulated Order (ECF No. 28). This injunction shall remain in effect until the entry of final judgment in this action or until further order of the Court.

**IT IS SO ORDERED.**

**DATED: September 19, 2025**

**Hon. Cynthia Bashant, Chief Judge**
**United States District Court**

25cv1489